# IN THE SUPREME COURT OF TEXAS

No. 13-0745

GREATER HOUSTON PARTNERSHIP, PETITIONER,

v.

KEN PAXTON, TEXAS ATTORNEY GENERAL; AND JIM JENKINS, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

JUSTICE BOYD, joined by JUSTICE JOHNSON and JUSTICE WILLETT, dissenting.

Forty-two years ago, the Texas Legislature passed what has become "widely regarded as the strongest and most successful open government law in the country."[1] Just three years later, in this Court's first opinion addressing the new Texas Open Records Act,[2] we confirmed that it is the Legislature's policymaking role to balance "the public's right of access" against "potential abuses of the right," and the Court's role is merely "to enforce the public's right of access given by the Act." *Indus. Found. of the S. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 675 (Tex. 1976). Balancing these interests, the Legislature decided that the Act should apply to "the part,

---

[1] *City of Dall. v. Abbott*, 304 S.W.3d 380, 395 n.5 (Tex. 2010) (Wainwright, J., dissenting); *see also* CHARLES L. BABCOCK ET AL., OPEN GOVERNMENT GUIDE: OPEN RECORDS AND MEETINGS LAWS IN TEXAS 1–2 (6th ed. 2011) (describing Texas Public Information Act as "among the strongest in the nation" and "among the most liberal in the United States"), *available at* http://www.rcfp.org/rcfp/orders/docs/ogg/TX.pdf.

[2] Act of May 19, 1973, 63d Leg., R.S., ch. 424, 1973 Tex. Gen. Laws 1112–18 (codified at TEX. REV. CIV. STAT. art. 6252-17a). In 1993, the Legislature codified the Act in the Texas Government Code and renamed it the Texas Public Information Act. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, secs. 552.001–.353, 1993 Tex. Gen. Laws 583, 594–607 (codified at TEX. GOV'T CODE §§ 552.001–.353).

section, or portion" of any "organization [or] corporation . . . that is supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). That may be bad policy, or it may be good policy, but it is *the* policy of Texas, and this Court's only task is to enforce it.

To enforce the Legislature's policy choice in this case, we must decide what it means for a "part, section, or portion" of a corporation to be "supported in whole or in part by public funds." *See id.* The Court adopts the narrowest construction possible, identifying two requirements that appear nowhere in the statute's language. The Court's all-or-nothing construction is irreconcilable with the provision's express inclusion of a "part, section, or portion" of an entity that is "supported in whole *or in part* by public funds." *See id.* (emphasis added). Striving to be faithful to the Act's plain language, mindful of its express mandate that courts construe it liberally in favor of access to information, and respectful of the many prior decisions of the Texas Attorneys General charged with interpreting and enforcing the Act, I would hold that a "part, section, or portion" of a private organization or corporation is "supported in whole or in part by public funds" and thus a "governmental body" if it (1) receives public funds, (2) not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the entity's activities, and (3) those activities promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship. Because the evidence establishes all three of these elements in this case, I would hold on this record that the Greater Houston Partnership is a governmental body. Because the Court holds otherwise, I respectfully dissent.

2

# I.
# Background

This case presents a single question of statutory construction: what does the Texas Public Information Act mean when it refers to a "part, section, or portion" of an entity that is "supported in whole or in part by public funds"? *Id.* Purporting to rely on "[f]amiliar interpretive guides and established canons of construction," *ante* at __, the Court discards over forty years of legal interpretations and announces a brand new interpretation that, at best, reflects the Court's concerns instead of the Legislature's language. In light of the Court's analysis, and to place the issue in perspective, I begin by highlighting the Act's relevant requirements, the reasons for its enactment, prior constructions of the language at issue, and the evidence here regarding the Partnership and its support.

## A.      Requirements of the Act

The Public Information Act requires the "officer for public information of a governmental body"[3] to "promptly produce public information" upon request. TEX. GOV'T CODE § 552.221(a). "Public information" means information "that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business," either (1) "by a governmental body;" (2) "for a governmental body" if the governmental body owns the information, has a right of access to it, or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information;" or (3) "by an individual officer or employee of a governmental body in the

---

[3] An "officer for public information" is the governmental body's chief administrative officer (or, in the case of a county, an elected county officer), and the head of each department within the governmental body is the officer's agent for purposes of complying with the Act. TEX. GOV'T CODE §§ 552.201–.202.

officer's or employee's official capacity and the information pertains to official business of the governmental body." *Id.* § 552.002(a). "Information is in connection with the transaction of official business if the information is created by, transmitted to, received by, or maintained by an officer or employee of the governmental body in the officer's or employee's official capacity, or a person or entity performing official business or a governmental function on behalf of a governmental body, and pertains to official business of the governmental body." *Id.* § 552.002(a-1).

The Act does not require a governmental body to produce public information that is "considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. The Act itself provides numerous other exceptions to its disclosure requirement, which include, among other things, certain personnel records, *id.* § 552.102, litigation records, *id.* § 552.103, information that "would give advantage to a competitor or bidder," *id.* § 552.104, attorney-client information, *id.* § 552.107, trade secrets and commercial financial information, *id.* § 552.110, personal and family information of governmental employees, *id.* § 552.117(a), and "information [that] relates to economic development negotiations involving a governmental body and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body," *id.* § 552.131(a). The Act does not allow a governmental body to unilaterally decide for itself whether it can withhold requested information. Instead, a governmental body that wishes to withhold information in response to a request must ask the Attorney General to decide whether the information fits within one of the Act's exceptions. *Id.* § 552.301(a).

It is difficult to overstate the Attorney General's role in this process. The Act assigns to the Attorney General the duty to "maintain uniformity in the application, operation, and interpretation" of the Act and authorizes the Attorney General to "publish any materials, including detailed and comprehensive written decisions and opinions, that relate to or are based on this chapter." *Id.* § 552.011. Upon receipt of a governmental body's request for a decision, the Attorney General considers comments and arguments from any interested person, *id.* § 552.304(a), and then must "promptly render a decision" on whether the requested information is within one of the Act's exceptions, *id.* § 552.306(a); *see also id.* § 552.306(b) (requiring the Attorney General to issue "a written opinion" and provide a copy to the requestor). Through its Open Records Division, the Attorney General's Office issues thousands of open records letter rulings every year, including more than 23,000 in 2014, and it is on pace to surpass that number this year.[4] If a governmental body fails to request an Attorney General decision when and as

---

[4] *See Open Records Letter Rulings (ORLs)*, OFFICE OF THE ATT'Y GEN. OF TEX., www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). Texas law authorizes the Attorney General to announce legal determinations in various forms. The Government Code, for example, authorizes the Attorney General to provide "a written opinion" to certain governmental officials addressing "a question affecting the public interest or concerning the official duties of the requesting person." TEX. GOV'T CODE § 402.042(a). The Attorney General's determinations under this authority are commonly referred to as "attorney general opinions" and are named numerically using the initials of the issuing Attorney General as a prefix. *See About Attorney General Opinions*, OFFICE OF THE ATT'Y GEN. OF TEX., www.texasattorneygeneral.gov/opinion/about-attorney-general-opinions (last visited June 22, 2015). In addition, the Public Information Act authorizes and requires the Attorney General to issue a "decision," in the form of a "written opinion," announcing whether a governmental body may withhold information in response to a request under the Act. TEX. GOV'T CODE §§ 552.301(a), .306(a), (b). Pursuant to this authority, Attorneys General sometimes issue "open records decisions," which "are formal opinions relating to the Public Information Act" that "usually address novel or problematic legal questions and are signed by the Attorney General." *See Open Records Decisions (ORDS)*, OFFICE OF THE ATT'Y GEN. OF TEX., www.texasattorneygeneral.gov/og/open-records-decisions-ords (last visited June 22, 2015). These decisions are named numerically using the initials "ORD" as a prefix. *See id.* More often, Attorneys General have resolved open records questions by issuing "open records letter rulings," which "[u]nlike Open Records Decisions, [are] informal letter rulings . . . applicable only to the specific documents and circumstances surrounding them[.]" *See Open Records Letter Rulings (ORLs)*, OFFICE OF THE ATT'Y GEN. OF TEX., www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). These rulings are named numerically using the initials "OR" and the year of issuance as a prefix. *See id.* Through the years, Texas Attorneys

required, the requested information "is presumed to be subject to required public disclosure and must be released unless there is a compelling reason to withhold the information." *Id.* § 552.302.

If a governmental body refuses to request an Attorney General decision or refuses to produce public information or information that the Attorney General has determined is public and not excepted from disclosure, the Attorney General or a requestor may file suit for a writ of mandamus compelling the governmental body to make the information available. *Id.* § 552.321. Conversely, a governmental body may file suit against the Attorney General, seeking declaratory relief from compliance with the Attorney General's decision. *Id.* § 552.324(a). In that suit, however, a governmental body can only rely on exceptions it asserted when it requested the Attorney General's decision, unless the exception is based on a federal law requirement or involves another person's property or privacy interests. *Id.* § 552.326(a), (b).

The Act's requirements apply only to a "governmental body," which the Act defines to mean:

(i)     a board, commission, department, committee, institution, agency, or office that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members;

(ii)    a county commissioners court in the state;

(iii)   a municipal governing body in the state;

(iv)    a deliberative body that has rulemaking or quasi-judicial power and that is classified as a department, agency, or political subdivision of a county or municipality;

(v)     a school district board of trustees;

---

General have utilized all three methods to address open records issues, including the issue of what constitutes a "governmental body" under the Act.

(vi)    a county board of school trustees;

(vii)   a county board of education;

(viii)  the governing board of a special district;

(ix)    the governing body of a nonprofit corporation organized under Chapter 67, Water Code, that provides a water supply or wastewater service, or both, and is exempt from ad valorem taxation under Section 11.30, Tax Code;

(x)     a local workforce development board created under Section 2308.253;

(xi)    a nonprofit corporation that is eligible to receive funds under the federal community services block grant program and that is authorized by this state to serve a geographic area of the state;  and

(xii)   the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds[.]

*Id.* § 552.003(1)(A)(i)–(xii). The question here is whether the Greater Houston Partnership is "supported in whole or in part by public funds," and thus a "governmental body" under part (xii). "Public funds" means "funds of the state or of a governmental subdivision of the state." *Id.* § 552.003(5).

**B.      Reasons for the Act**

The Public Information Act is unique in its extensive explanation of the policies that led to its enactment. As the Court explains, the Legislature first adopted the Act in response to the "Sharpstown scandal." *Ante* at __. The Act begins by expressing the "fundamental philosophy" that "government is the servant and not the master of the people" and "the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). While the people of Texas have delegated

7

governing authority to public employees, they "do not give their public servants the right to decide what is good for the people to know and what is not good for them to know." *Id*. Because "[t]he people insist on remaining informed so that they may retain control over the instruments they have created," the Act expressly provides that it "shall be liberally construed to implement this policy." *Id*. Courts must construe the Act's provisions "in favor of disclosure of requested information." *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011); *see also* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information.").

## C. Prior Constructions of the Act

Pursuant to their responsibility to "maintain uniformity in the application, operation, and interpretation" of the Act, TEX. GOV'T CODE § 552.011, Texas Attorneys General have issued numerous opinions addressing whether private entities—including several chambers of commerce and similar organizations—were "supported in whole or in part by public funds." Respecting the Attorney General's unique role, courts have given deference to Attorney General interpretations and applications, most notably the Fifth Circuit in *Kneeland v. National Collegiate Athletic Ass'n*, 850 F.2d 224, 228 (5th Cir. 1988).

### 1. Pre-*Kneeland* Attorney General Decisions

In 1973, shortly after the Act became effective, the Attorney General's very first open records decision addressed the statutory language we address today and concluded that a private bank was not "supported in whole or in part by public funds" merely because it received and held deposits of public funds. Tex. Att'y Gen. ORD-1 (1973). Six years later, the Attorney General concluded that an organization very similar to the Partnership—a private, nonprofit

8

corporation chartered to promote the interests of the Dallas-Fort Worth metropolitan area—was a governmental body under the Act. Tex. Att'y Gen. ORD-228 (1979). Pursuant to a contract, the City of Fort Worth paid the corporation $80,000 to "[c]ontinue its current successful programs and implement such new and innovative programs as will further its corporate objectives and common City's interests and activities" over a three-year period. *Id.* The Attorney General concluded that, by using the phrase "supported in whole or in part," the Legislature "did not intend to extend the application of the Act to private persons or businesses simply because they provide specific goods or services under a contract with a governmental body." *Id.* But this contract did not "impose a specific and definite obligation on the [corporation] to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.* Thus, not every "contract with a governmental body causes the records of a private contractor to be open," but a private entity is supported by public funds, and is thus a "governmental body," when the public funds are "used for the general support of the [entity] rather than being attributable to specific payment for specific measurable services." *Id.*

Three years later, the Attorney General relied on ORD-228 to find that another chamber-of-commerce-like organization—a private, nonprofit entity created to promote manufacturing and industrial development in the Bryan area—was a governmental body because the City of Bryan's contractual payment of $48,000 was like an "unrestricted" grant, rather than payment for specific measurable services. Tex. Att'y Gen. ORD-302 (1982) (noting that the situation was "virtually identical" to that in ORD-228). That same year, the Attorney General concluded that a private medical service provider for the Amarillo Hospital District was not a governmental body

9

under the Act because the parties' contract prescribed specific measurable services, including ambulance services, for which the provider received a monthly sum "equal to the difference between cash receipts and approved operating expenditures of the ambulance service." Tex. Att'y Gen. ORD-343 (1982).

The following year, the Attorney General determined that a proposed athletic conference consisting of member universities would be a governmental body under the Act because each university would pay an upfront "membership fee" and subsequent annual fees that would be used for the conference's "general support . . . rather than being attributable to specific payments for specific measurable services." Tex. Att'y Gen. Op. No. JM-116 (1983) (quoting Tex. Att'y Gen. ORD-228). The conference's constitution stated one of its purposes was to aid members in incorporating intercollegiate athletics within their educational programs and to "place and maintain such athletics under the same administrative and academic control." *Id.* The constitution did not identify any specific, measurable services that the conference would provide in exchange for the public funds. *Id.*

The Attorney General later determined that a private high school and a private nonprofit water supply corporation were not governmental bodies because neither of them received any public funds. Tex. Att'y Gen. Op. Nos. JM-154 (1984), JM-596 (1986). Then, in 1987, the Attorney General concluded that a volunteer fire department was a governmental body under the Act because fire protection is "traditionally provided by governmental bodies," volunteer fire departments have "strong affiliations with public agencies," and the contract provided the department with funds "to carry on its duties and responsibilities," which the Attorney General considered to be for its "general support." Tex. Att'y Gen. Op. No. JM-821 (1987). The Attorney

General stated that the "test" for whether an entity is a governmental body under the Act "cannot be applied mechanically" and that the "precise manner of funding is not the sole dispositive issue." *Id.* Instead, the Attorney General considered "[t]he overall nature of the relationship," and concluded "a contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship" will bring the private entity within the Act's definition of governmental body. *Id.*

### 2.      *Kneeland v. NCAA*

In 1988, the Fifth Circuit was asked whether the National Collegiate Athletic Association (NCAA) and the former Southwest Conference (SWC), which received public funds from several Texas public universities, were "supported in whole or in part by public funds" and thus "governmental bodies" under the Act. *Kneeland*, 850 F.2d at 228. In addressing this issue, the Court expressly based its analysis on the Attorneys General's prior decisions, noting that "[t]he usual deference paid to formal opinions of state attorneys general is accentuated in this case because the Texas Legislature has formally invited its Attorney General to interpret the Act when asked to do so." *Id.* at 228–29. Construing the statute's language and extrapolating principles from the Attorneys General's decisions, the Court cobbled together the following criteria—now known as the "*Kneeland* test"—for determining whether a private entity is "supported . . . by public funds" and thus a governmental body under the Act:

- "The Act does not apply to 'private persons or businesses simply because they provide specific goods or services under a contract with a government body.'" *Id.* at 228 (quoting Tex. Att'y Gen. ORD-1).

- "[A]n entity receiving public funds becomes a governmental body under the Act, unless its relationship with the government imposes 'a specific and definite obligation . . . to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and

11

purchaser.'" *Id.* (quoting Tex. Att'y Gen. Op. No. JM-821, which quotes Tex. Att'y Gen. ORD-228).

- "[A] contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship between a private entity and a public entity will bring the private entity within the . . . definition of a 'governmental body.'" *Id.* (quoting Tex. Att'y Gen. Op. No. JM-821).

- "[S]ome entities, such as volunteer fire departments, will be considered governmental bodies if they provide 'services traditionally provided by governmental bodies.'" *Id.* (quoting Tex. Att'y Gen. Op. No. JM-821).

Based on these principles and the Attorneys General's decisions from which they were drawn, the *Kneeland* court held that the NCAA and SWC were not governmental bodies under the Act. *Id.* at 230–31. With respect to the NCAA, the court concluded that the universities "receive[d] a *quid pro quo*, in sufficiently identifiable and measurable quantities of services," in exchange for the public funds they paid to the NCAA. *Id.* at 230. Similarly, the court concluded that the SWC provided "specific and guageable services which negate[d] the general support element required for a governmental body designation." *Id.* at 231.

### 3. Post-*Kneeland* Attorney General Decisions

Attorneys General have had several opportunities to address the issue since *Kneeland*, and in doing so have adopted the federal court's synopsis of the principles from their prior decisions. A few years after *Kneeland*, the Attorney General concluded that a private commission created by the San Antonio Chamber of Commerce to coordinate the annual Fiesta celebration was not a governmental body. Tex. Att'y Gen. ORD-569 (1990). The city designated the commission as its "official agency" responsible for planning, coordinating, and financially supporting the festival and gave the commission the right, subject to necessary approvals, to lease city-owned premises, obtain permits for parades and concession stands along parade route,

12

grant permission to place seating along parade route, and assign its permit and lease rights to other entities sponsoring the event. *Id.* The Attorney General nevertheless concluded that the commission was not a governmental body because it did not receive any public funds. *Id.* ("The threshold question is whether the commission receives any funds from the City of San Antonio."). The Attorney General rejected the argument that money the commission received from the sale of tickets for seating along the parade route was "public funds" because the money would otherwise have been paid to the city. *Id.* ("By requiring the commission to get a permit for erecting bleachers and limiting the charge per seat, the city is not granting public funds to the commission, nor do the charges for seats constitute funds of the city.").

In 1992, the Attorney General concluded that the Dallas Museum of Art was a governmental body under the Act, even though it received 85% of its revenue from private sources. Tex. Att'y Gen. ORD-602 (1992). The city owned some of the artwork at the museum, owned and maintained the premises housing the museum, and paid the museum's utilities, half of the museum employees' salaries, and a pro rata portion of the insurance premiums. *Id.* The museum admitted that it received public funds but argued that it received the funds in exchange for "known, specific, and measurable services" as opposed to general support. *Id.* Relying on *Kneeland* and the prior decisions, the Attorney General disagreed, concluding that while the city received "valuable services in exchange for its obligations" to the museum, those "highly specialized, unique services" could not be "known, specific, or measurable," and the city thus instead provided funds for the museum's general support. *Id.* The Attorney General nevertheless held that the museum was not required to disclose the requested records because only the part of the museum supported by public funds was a governmental body, and the records related to a

13

collection the museum owned as part of its permanent collection, not to the part of the museum for which the city provided "direct support." *Id.* (noting the city's ownership of the building in which the collection was housed and its payment of a portion of the overhead expenses was "tangential" and "insufficient to bring documents relating to the collection within the scope of the act").

Again addressing chamber-of-commerce-type entities, the Attorney General conducted a similar analysis in holding that the Arlington Chamber of Commerce and the Arlington Economic Development Foundation were governmental bodies under the Act. *See* Tex. Att'y Gen. ORD-621 (1993). The foundation admitted that it received public funds but argued that it did so in exchange for specific, measurable services. *Id.* The Attorney General disagreed, concluding that while the city received "valuable services in exchange for the public funds," the agreement failed "to impose on the foundation a specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect to find in a typical arms-length contract." *Id.* The Attorney General concluded that the chamber of commerce was also a governmental body, even though it received public funds through the foundation rather than from the city directly. *Id.*

Eight years later, the Attorney General reached the same result with respect to the Round Rock Chamber of Commerce, observing that its contract with the City of Round Rock neither restricted the chamber's use of the public funds it received nor imposed any "specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect to find in a typical arms-length contract." Tex. Att'y Gen. OR2001-4849 (2001).

And a few years after that, the Attorney General held that the Greater Houston Partnership itself was a governmental body under the Act, under a similar analysis. Tex. Att'y Gen. OR2004-4221 (2004). The Partnership specified in its request for an Attorney General's ruling that the requested records related to a project being handled by a specific part of the Partnership, the Economic Development Division. At that time, different contracts governed the Partnership's relationship with the City of Houston. Examining those contracts' provisions—including one that obligated the Partnership to "support the efforts of the University of Houston Small [B]usiness Development Center in the conduct of the Director Business Assistance Program, designed to assist and promote the efforts of local businesses and entrepreneurs to form new business ventures or to expand existing business ventures"—the Attorney General determined that, "[a]lthough . . . the city is receiving valuable services in exchange for its obligations under this contract, the [Partnership] has not sufficiently demonstrated that the nature of the services it provides are known, specific, or measurable." *Id.* "Consequently," the Attorney General concluded, "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information." *Id.* (emphasis added).

In addition to arguing that it was not a governmental body, the Partnership alternatively relied on the Act's exceptions to disclosure for certain economic development information and for certain email addresses. *See id.*; TEX. GOV'T CODE §§ 552.131 (excepting certain information relating to economic development negotiations), 552.137 (excepting certain email addresses). The Attorney General agreed in part and disagreed in part, instructing the Partnership to release

some but not all of the documents submitted to the Attorney General for review. *See* Tex. Att'y Gen. OR2004-4221.

In 2007, the Attorney General again relied on *Kneeland* and the distinction between use of public funds for "general support" as opposed to payment for "specific and measurable services" to conclude that a family planning service provider that contracted with the Department of State Health Services was a governmental body under the Act. Tex. Att'y Gen. OR2007-06167 (2007). Similarly, in 2011, the Attorney General decided that channelAustin, a nonprofit corporation that contracted with the City of Austin "to manage the equipment, building, resources, and the three channels for Public Access," received public funds as an "unrestricted grant" for its "general support rather than payment for specific services." Tex. Att'y Gen. OR2011-17967 (2011).

In a 2008 formal opinion, the Attorney General observed, consistent with the *Kneeland* test, that it is sometimes significant that the private entity has a "common purpose or objective or one that creates an agency-type relationship" with the governmental entity, or that it performs services "traditionally provided by governmental bodies." Tex. Att'y Gen. Op. No. GA-666 (2008). But the Attorney General explained that the "primary test" is "whether the entity receives public funds for the general support of its activities, rather than using those funds to perform a specific and definite obligation." *Id*. (determining that an association of appraisal districts, which received membership fees from governmental entities in exchange for promoting "effective and efficient functioning and administration of appraisal districts in Texas," was a governmental body). Four years later, the Attorney General held that a health services provider was a governmental body under the Act because the contract language evidenced a "common purpose

16

or objective between the health service and the district such that an agency-type relationship [wa]s created." Tex. Att'y Gen. OR2012-11220 (2012) (considering contract in which the parties agreed "to cooperate to provide services to the residents of Nacogdoches County who are in need of service avoiding duplication of services when possible" and "to refer patients for services, as needed, and in doing so will provide documentation for patient records when needed").

## D. The Partnership's "Support"

With the statute's language and these prior decisions in mind, I turn to the facts at issue here. The Greater Houston Partnership is a private nonprofit corporation that functions as a chamber of commerce to promote job creation, increased trade, and capital investment in the greater Houston area. For many years, including 2007 and 2008, the Partnership entered into an annual "Agreement for Professional Services" with the City of Houston, in which the Partnership agreed to perform certain marketing, research, and promotional services designed "to increase investment in, and to improve the economic prosperity of Houston and the Houston Airport System."[5] The contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan." (Emphasis added). In exchange for these services, the City agreed to pay the Partnership a lump sum amount of $196,250.00 per quarter. The City's payments constituted less than 8% of the Partnership's total annual revenue, 90% of which came from dues the Partnership's members paid.

---

[5] The Local Government Code authorizes municipalities to contract with private entities like the Partnership "for the administration of a program" to promote "local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODE § 380.001.

The services agreements specified that the Partnership was an independent contractor, but they also gave the City certain rights to participate in and control some of the Partnership's activities. Among other things, the Partnership agreed to coordinate its efforts with the directors of the City's Department of Convention & Entertainment Facilities, Department of Planning and Development, and the Houston Airport System (the Directors); to submit quarterly progress reports "describing in detail services performed"; to provide any other reports the Directors request; to produce any non-confidential records the City Attorney requires to evaluate the Partnership's compliance with the contract; and to inform the City of any claims arising out of the Partnership's failure to pay its employees, subcontractors, or suppliers. The contracts granted the City "full membership and exclusive benefits as a General Partner" of the Partnership, which included membership in the Partnership's policy-level committees, but prohibited the City from participating on any of the Partnership's governing boards.

The 2008 agreement differs from the 2007 agreement in several respects. While the 2007 agreement required the Partnership to "implement a program" to increase investments in the Houston area, the 2008 agreement required the Partnership to provide "specific, measurable services" to increase investments. While the 2007 contract permitted the City to require the Partnership to terminate any employee or subcontractor whose work the Directors deemed unsatisfactory, the 2008 contract only required the Partnership to "consider removing" any such employee or subcontractor. And unlike the 2007 agreement, the 2008 agreement stated that the City's payments were solely for services rendered and were not intended as general support for the Partnership's other activities, and expressly provided that nothing in the agreement shall be construed to imply that the Partnership is subject to the Texas Public Information Act.

In May 2008,[6] Houston-area resident Jim Jenkins submitted a Public Information Act request to the Partnership, asking that it provide him with "a copy of the check register . . . for all checks [the Partnership] issued for the year 2007," including "for each check issued: check number, check date, payee name, and check amount." Jenkins later submitted a second request, seeking the same information for all checks the Partnership issued in 2008. The Partnership refused to provide the requested information, and instead asked the Attorney General to decide whether the Partnership is a "governmental body" subject to the Public Information Act. The Partnership did not assert that only "a part, section, or portion" of the Partnership is "supported in whole or in part by public funds," as it had successfully argued in 2004. *See* Tex. Att'y Gen. OR2004-4221. Nor did it assert that any information in the check register was not "public information" or that one of the Act's exceptions applied, as it had also asserted in 2004. *See id.* Instead, the Partnership relied solely on its contention that it is not a governmental body under the Act.

Consistent with its 2004 ruling, the Attorney General's Open Records Division ruled that the Partnership is a governmental body and must comply with the Act's requirements. Tex. Att'y Gen. OR2008-16062 (2008). The Partnership filed suit against the Attorney General to challenge the ruling, and Jenkins intervened. The trial court agreed with the Attorney General and held that the Partnership is a governmental body under the Act. The Partnership appealed, and the court of appeals affirmed, with one justice dissenting. 407 S.W.3d 776. We initially denied the

---

[6] The Partnership and City executed the 2008 services agreement in August 2008, a few months after receiving Jenkin's first request for information, which may explain the differences we have described between the 2007 and 2008 agreements.

Partnership's petition for review, but we later granted its motion for rehearing and its petition, to address when a private entity may qualify as a governmental body under the Act.

## II.
### "Supported in Whole or In Part"

The issue here is whether the Greater Houston Partnership is "supported in whole or in part by public funds" and is thus a "governmental body" under the Act.[7] The interpretation of the Act presents questions of law. *City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 357 (Tex. 2000). In light of the Act's strong policy in favor of disclosure, a party seeking to withhold requested information bears the burden of proving that the information is not subject to disclosure under the Act. *See Thomas v. Cornyn*, 71 S.W.3d 473, 488 (Tex. App.—Austin 2002, no pet.) (holding that "a governing body should bear the burden of proving in a judicial proceeding that an exception to disclosure applies").

The Partnership makes three arguments as to why it is not a "governmental body" under the Public Information Act. First, the Partnership contends the phrase "supported . . . by public funds" unambiguously does not include the City's contractual payments to the Partnership. Next, the Partnership argues, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory language. Third, if the Court does adopt the *Kneeland* test, the Partnership argues it is not "supported . . . by public funds" even under that test. The Court agrees with the Partnership's first argument—that the statute

---

[7] Although the Partnership has previously argued that requested records related solely to its Economic Development Division, *see* Tex. Att'y Gen. OR2004-4221 (2004), it has made no similar effort to identify or limit the Act to any particular sections or divisions in this case. Our issue is therefore whether the Partnership, as a whole, is "supported in whole or in part by public funds," and not whether any particular "part, section, or portion" of the Partnership is.

unambiguously does not apply to the Partnership—but also notes its displeasure with the *Kneeland* test. I disagree. I would hold that the statute is ambiguous, adopt but clarify the *Kneeland* test, and conclude that under that test the Partnership "is supported in whole or in part by public funds."

## A.      The Court's Interpretation

The Court begins its analysis by noting that the term "supported" can have several different meanings. *Ante* at __. Because "supported by" in the clause at issue refers specifically to "public funds," the Court concludes that the Act focuses solely on monetary support. *Ante* at __. The Court then proceeds to identify two different requirements that must each exist for a private entity to receive monetary "support," which I will refer to as the "sustenance" requirement and the "functional equivalent" requirement. *Ante* at ___ (agreeing with Partnership's contention that definition only includes "entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds"). Although the Court asserts that it is simply applying a "plain language" approach to construing the statute, *ante* at ___, and is not relying on any "extra-textual analytical construct," *ante* at ___, neither of the Court's two requirements appears anywhere in the statute's language. I do not agree that the Act's language "unambiguously" supports the judicial insertion of either requirement into its definition of a "governmental body."

### 1.      The "Sustenance" Requirement

Addressing the first requirement, the Court says "supported" can mean (and here must mean) "sustenance, maintenance, or both." *Ante* at __. The Court provides this as the "maintenance" definition of "supported": "to pay the costs of: maintain; to supply with the

21

means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining[.]" *Ante* at __ (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002)). The Court then concludes that "supported" cannot mean "maintenance" in this context because otherwise the definition would include "any private entity that received any public funds," and "even a paper vendor with hundreds of clients would qualify as a 'governmental body' merely by virtue of selling office supplies to a single state office." *Ante* at __.

In contrast to the "maintenance" definition, the Court gives this "sustenance" definition of "supported": "to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of." *Ante* at __ (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY at 2297). The Court thus distinguishes between the "maintenance" meaning of "supported" and the "sustenance" meaning of "supported" and concludes that in the context of the Act, "supported by" can only mean the latter, so the Act applies only to private entities "sustained, at least in part, by public funds, meaning they would not perform the same or similar services without public funds." *Ante* at __.

Although the Court reads far more into these two definitions of "support" than I find there, as explained below, I generally agree that the term "support" must refer here to monies paid as general funds to sustain the recipient, rather than funds paid as consideration for specific goods or services. But the Court goes far beyond that principle today, and holds that an entity is "supported in whole or in part by public funds" only if the entity cannot survive without those funds. As a result, the Court writes the words "in part" completely out of the statutory definition. To be sure, the Court creates the appearance that it is actually enforcing the statute as written by referring to the "supported . . . in part" language several times in its opinion:

- "requires us to decide whether the term 'supported' encompasses private entities . . . sustained—in whole *or in part*—by [public] funds," *ante* at ___ (emphasis added);

- "'supported' . . . unambiguously includes only those entities *at least partially* sustained by public funding," *ante* at __ (emphasis added);

- "[the Partnership] is not wholly or *partially* sustained by public funds," *ante* at ___ (emphasis added);

- "the [Act] applies only to entities acting as the functional equivalent of a governmental body that are 'sustained' *at least in part*, by public funds," *ante* at __ (emphasis added); and

- "we define 'supported in whole or *in part* by public funds' to include only those private entities or their sub-parts sustained, *at least in part*, by public funds," *ante* at ___ (emphases added).

But despite these lip-service payments to the statute's language, the Court repeatedly holds that an entity (or any part, section, or portion of an entity) that receives public funds as sustenance (as opposed to maintenance) is not a governmental body unless it cannot survive and pursue its mission without those funds:

- "defining 'supported' as 'sustenance' ensures that only an entity, or its 'part, section or portion,' whose existence is predicated on the continued receipt of government funds would qualify as a 'governmental body,'" *ante* at __;

- "[t]o be 'sustained' by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision," *ante* at __;

- "a private entity would qualify under a financially dependent construction of 'supported' if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors. In short, an entity 'supported' by public funds would not just receive government funds; it would require them to operate in whole or in part," *ante* at __;

- "[the Partnership] is not 'supported' by public funds because it receives only a small portion of its revenue from government contracts[, a]nd even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources," *ante* at ___;

23

- "the statute encompasses only those private entities dependent on the public fisc to operate as a going concern," *ante* at ___; and

- "An entity . . . that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds," *ante* at __.

The Court thus holds that a private entity that receives public funds can be a governmental body under the Act only if it cannot "survive" or "exist" or "pursue its mission and objectives" without those public funds, even if those funds are just "one of several contributing sources." I disagree. An entity that is "sustained" (as the Court uses that word) by funds it receives from several different sources is sustained "in part" by the funds from each of those sources, even if it could survive and pursue its mission without the funds from any one source. The Court asserts that "sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations." *Ante* at ___. But even if that were true,[8] "sustenance *in part*" implies the exact opposite. If "part" of an entity's "sustenance" comes from one source, it is "sustained *in part*" by that source even if it could survive without that part.

The Court attempts to justify its "surviv[al]" requirement by suggesting that the statute's "'in part' language may envision a multi-division entity that does business with the government, but not uniformly and not across all units." *Ante* at ___. "For instance," the Court explains, if a "large corporation" has a "subdivision" that "is wholly funded by government contracts," but the

---

[8] The Court fails to identify any dictionary that defines "supported" to mean financially dependent upon for its very existence. *See ante* at __. While there are many definitions of "support" that refer to "sustenance or maintenance" or even "*a* basis for the existence or subsistence of," *see ante* at __ (emphasis added), none of the definitions require an absolute dependence, and in any event, the statute's definition expressly excludes such a requirement by referring to support "in part."

government funds are only "a relatively small portion of the corporation's total revenue," the corporation "may be said to be supported 'in part' by public funds." *Ante* at ___. This illustration confuses the statute's reference to "supported in part" with its reference to the "part, section, or portion" of an entity. The statute provides that the "part, section, or portion" of an entity is a governmental body if it is "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court is correct that, if one subdivision of a large corporation is "supported in whole . . . by public funds," then the corporation itself is "supported . . . in part by public funds." But the statute permits the corporation to limit the Act's application to the subdivision by showing that only that subdivision (i.e., that "part, section, or portion" of the corporation) is "supported in whole or in part" by public funds. The illustration the Court "conceptualize[s]" has nothing to do with the Court's "surviv[al]" requirement.

A relevant illustration is this: even if only 5% of the funds that support the Court's hypothetical corporate subdivision were public funds, the subdivision would still be "supported *in part*" by those funds, and would thus be a governmental body under the Act's plain language. An entity "supported . . . in part by public funds" is a governmental body, regardless of whether it could "survive" or "pursue its mission" without those funds. *See id.* The Court's construction reads this language out of the Act by requiring the whole of the entity to live or die by the public fisc.

### 2. The "Functional Equivalent" Requirement

The Court also holds that an entity is not "supported in whole or in part by public funds" unless it is "acting as the functional equivalent of a governmental body," *ante* at __, and providing "services traditionally considered governmental prerogatives or responsibilities," *ante*

at __. As with its first requirement, the Court does not derive this requirement from the statutory definition at issue. Subsection (xii) expressly identifies several types of entities that typically are not public (or governmental) entities, including an "organization," a "committee," an "institution," and—importantly, here—a "corporation." The Act says such private entities are governmental bodies if they are "supported in whole or in part by public funds," not if they are acting as the "functional equivalent" of a governmental body or performing traditional government responsibilities. TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court, however, asserts three bases for imposing this requirement: (1) the Act's "stated purpose"; (2) the statute's omission of "any broad reference to private entities"; and (3) the "scope and nature of the eleven other types of entities more clearly described as a 'governmental body' in the same provision," *ante* at __. I do not agree that any of these justifies writing the Court's "functional equivalent" requirement into the statute.

First, the Court suggests that requiring a private entity to be the "functional equivalent" of a governmental body is necessary to ensure that our construction of "supported" is "compatible with" the Act's "stated purpose." *Ante* at ___ This "stated purpose," the Court explains, is to provide the public with "complete information about the affairs of government and the official acts of public officials and employees" to "allow the public to 'retain control over the instruments they have created.'" *Ante* at __ (quoting TEX. GOV'T CODE § 552.001(a)). Although the Court makes no effort to explain why this purpose necessitates or implies the "functional equivalent" requirement, I presume the Court finds hidden meaning in the purpose statement's reference to the "affairs of *government*," the "acts of *public* officials and employees," and the "*instruments* . . . created," as if the words I have emphasized exclude any purpose to require

26

disclosure of information held by a private entity. But to emphasize a different word, the statute's purpose is to provide "*complete* information" about those affairs, acts, and instruments. The Legislature may have believed that the only way to ensure the public has "complete" information about what their government is doing is to treat some private entities as governmental bodies under the Act. Whatever we may presume about what the Legislature may have "believed," what the Legislature "said" was that "governmental body" includes any entity "supported in whole or in part by public funds," not any entity that is the "functional equivalent" of a governmental body.

As a second reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court asserts that the definition does not include "any broad reference to private entities." *Ante* at ___.[9] Assuming that the Legislature "carefully omitted" any such "broad reference," and presuming that the Legislature "purposefully selected" this omission, the Court concludes that the definition, "as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government," and thus "only applies to private entities acting as the functional equivalent of the government." *Ante* at ___. Respectfully, I fail to follow the Court's logic. It might be logical to conclude from the omission of any "broad reference" to private entities that the Legislature did not intend to include *all* private entities as "governmental bodies." But it is illogical to conclude that the omission of a "broad reference" somehow indicates which private entities the Legislature intended to include

---

[9] This assertion is simply wrong. The very definition at issue "broadly refers" to private entities by using a string of particularly broad terms to reference private entities of all types: "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or is supported in whole or in part by public funds[.]" TEX. GOV'T CODE § 552.001(1)(A)(xii). The "omission" on which the Court relies simply does not exist.

and which it did not. And it is simply preposterous to conclude that the omission somehow indicates that they intended to include "only those entities acting as the functional equivalent of the government." *Ante* at ___. We need not engage in such sophistry, because the statute tells us which private entities the Legislature intended to include as governmental bodies: those that are "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court finds support for its judicially created functional equivalent test only by manufacturing a "broad reference" to stack upon its misconstruction of the Act's "stated purpose."

For the third (though "not dispositive") reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court relies on the "canon of statutory construction known as *noscitur a sociis*." *Ante* at __. This canon provides "that a word is known by the company it keeps." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 750 (Tex. 2006) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). It "directs that similar terms be interpreted in a similar manner," *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011), but there is no similarity between the words in definition (xii)—an "organization" or "corporation" that is "supported in whole or in part by public funds"—and those in the preceding definitions. If definition (xii) provided "general" language, following "specific and particularized enumerations" in the first eleven definitions, then we would "treat the general words as limited and apply them only to the same kind or class of [things] as those expressly mentioned." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex. 2003). But definition (xii) uses specific language, inherently different than the language of the other definitions, and thus refers to something specific, not just a catch-all to conclude the preceding definitions. Under *noscitur a sociis*, we should look to the words "immediately surrounding" the phrase "supported by," which

28

include the words "public funds" and, importantly, "in whole *or in part*" (which the Court ignores). *See* BLACK'S LAW DICTIONARY 1224 (10th ed. 2014) (defining *noscitur a sociis* as "a canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it").

Even if the Court were applying the doctrine of *noscitur a sociis* correctly here, that doctrine cannot be used to render express statutory language meaningless. "If . . . the specific terms exhaust the class of items enumerated in the statute, it must be presumed that any generic term that follows must refer to items transcending the class, since a contrary construction 'would contravene the more important rule of construction that all words are to be given effect.'" *Shipp v. State*, 331 S.W.3d 433, 437 (Tex. Crim. App. 2011) (quoting 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 47:21 at 390–91 (7th ed. 2007)); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."); *City of San Antonio*, 111 S.W.3d at 29 (rejecting construction that would render some statutory language unnecessary and citing *Spence v. Fenchler*, 180 S.W. 597, 601 (Tex. 1915), for the proposition that "[i]t is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative"). We must "read the statute contextually," *Office of Att'y Gen.*, 422 S.W.3d at 629, considering the relevant language in the context of the statute as a whole, rather than as "isolated provisions," *TGS–NOPEC Geophysical*, 340 S.W.3d at 439, and endeavoring to "giv[e] effect to every word, clause, and sentence," *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013), so that none of the language is rendered

superfluous, *see Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014). Because the Court's construction renders the phrase "in whole or *in part*" meaningless, I do not agree that definition (xii) includes "organizations" and "corporations" only if they "function as quasi-public" entities. *Ante* at __.

## B.      A More Accurate Interpretation

If a statute's words are susceptible to two or more reasonable interpretations, and we "cannot discern legislative intent in the language of the statute itself," the statute is ambiguous, and we may rely on applicable canons of statutory construction. *Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 639 (Tex. 2010). I would conclude that the words "supported by" are ambiguous in this context, and would thus grant deference to the Attorneys General's long-standing construction of the Act's definition of a "governmental body." *See Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629–30 (Tex. 2013) (stating that we grant deference to construction of agency that is charged with enforcement of statute if statute is ambiguous, agency interpretation results from formal proceedings, and interpretation is reasonable). Though not controlling, I would consider the Attorney General constructions to be persuasive, particularly in light of the responsibility the Legislature has given the Attorney General for "interpreting" and promoting uniformity in the application of the Act. *See* TEX. GOV'T CODE § 552.011; *see also City of Dall. v. Abbott*, 304 S.W.3d 380, 384 (Tex. 2010) (observing that Attorneys General's interpretations of Public Information Act are persuasive but not controlling). But I would also clarify the *Kneeland* test to provide greater simplicity and guidance.

**1.      Ambiguity**

The Court and the parties agree that not every private entity that contracts with the government and receives payments of public funds is "supported . . . by public funds." More specifically, they agree with the Attorneys General's conclusion that an ordinary, arms-length transaction between a private party and a governmental entity does not render the private party a "governmental body" under the Act. They agree that something more is required, but they dispute whether that something is present here. I too agree that something more is required, but I conclude that the statute is ambiguous as to what that something is.[10]

The phrase "supported by" can have multiple common, ordinary meanings, including:

1.   To carry the weight of, exp. from below.

2.   To maintain in position so as to keep from falling, sinking, or slipping.

3.   To be able to bear : WITHSTAND.

4.   To keep from failing or yielding during stress.

5.   To provide for, by supplying with money or necessities. <*support* a large family>

6.   To furnish corroborating evidence for <*support* a witness's testimony>

7.   To aid the cause of by approving, favoring, or advocating <*support* for a political candidate>

8.   To endure : tolerate.

---

[10] The Court argues that "governmental body" should not include every single vendor who sells a product or service to the government in a *quid pro quo* transaction, and cites authority from other jurisdictions to support this contention. This is, of course, a straw man argument, as everyone in the case agrees that we cannot construe the term that broadly. But merely because one extreme construction is available that would lead to an (arguably) absurd result does not mean that every less extreme construction within the range from narrowest to broadest possible constructions is unreasonable. Moreover, no one argues that the Partnership is merely an ordinary vendor under the contracts at issue here.

9. a. To act (a part or role). b. To act in a secondary or subordinate role to (a leading performer).

WEBSTER'S II NEW COLLEGE DICTIONARY 1108 (1995).

I agree with the Court that most of these definitions do not apply in this statutory context, which limits "support" to a function that can be performed by money. *See TGS-NOPEC Geophysical*, 340 S.W.3d at 441 (using statutory context to eliminate inapplicable meanings of a word in the statute). An ordinary reader could construe some of the broader definitions to include financial "support": e.g., public funds could "carry the [financial] weight of" an entity. *See* WEBSTER'S II NEW COLLEGE DICTIONARY at 1108. In context, the most relatable definition is "[t]o provide for, by supplying with money or necessities." *Id.* The Partnership relies on this common meaning and argues that, just as a person "pays" an employee but "supports" a family member, the City "paid" rather than "supported" the Partnership. But even this definition of "support" does not resolve the statute's ambiguity because the statute requires only that the entity be supported "in whole or *in part*" by public funds. TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added).

As the Court notes, in the broadest sense, virtually any income from public funds could reasonably be considered to "provide for" the Partnership "in part" by supplying it with money, even if the City pays the money in exchange for specific goods or services rendered. *Ante* at __; *see also Tex. Ass'n of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 591–92 (Tex. App.— Austin 2012, no pet.) (observing that the dictionary definitions of "support" are "so broad and varied that any private entity that receives any public funds can be said to be, at least in part, 'supported' by those public funds," yet all authorities have agreed that "simply receiving public funds does not make a private entity a 'governmental body' under the [Act]"). The same problem

results from the Court's definition of "supported" to mean "to provide a basis for the existence or subsistence of." *Ante* at __. At least "in part," the City's payments for chamber-of-commerce services provide a reason for the Partnership's existence and enable it to "pursue its mission," and the City's payments for those services constitute at least a "part" of the revenue that sustains the Partnership. *See ante* at __. I would conclude that the Act's reference to entities that are "supported in whole or in part by public funds" is ambiguous, and thus turn to existing precedents—and specifically Attorney General decisions and the *Kneeland* test—for further guidance.[11]

### 2.    A Clarified *Kneeland* Test

Although this Court has not previously construed the Act's "supported by" language, the Fifth Circuit has in *Kneeland*, and Attorneys General have since consistently relied on the *Kneeland* test as the governing standard. The Partnership urges us to reject the *Kneeland* test, asserting that it "has no basis in the statutory text" and leaves too much uncertainty in the law. The Attorney General counters that the *Kneeland* test "satisfies the legislature's intent[] to shed light on the affairs of government" and "provides a workable framework for determining whether an entity is a governmental body under the [Act] because it treats entities functioning as

---

[11] A statute is ambiguous if two or more plausible constructions are reasonable. *Tex. Lottery Comm'n*, 325 S.W.3d at 639. The Court finds the phrase "supported in whole or in part by public funds" unambiguous, although it suggests that two of the dictionary definitions ("sustenance" and "maintenance") are "remotely possible." *Ante* at ___. The Court pursues a backwards approach to the ambiguity analysis: it relies on context, purpose, and canons of construction first to exclude every possible meaning of the word "supported" except two, then to exclude all but the most narrow of those two "possible" definitions, and then declares that the term is "unambiguous" because there's only one "reasonable" definition." I find the term ambiguous because, even in context and considering the statute's purpose, it is susceptible to more than one reasonable meaning, and I thus turn to canons of construction and persuasive authorities for assistance in determining what the statute's actual language must mean.

governmental bodies as such while eliminating vendors providing goods and services through arms-length contracts from the definition."

I would conclude that the *Kneeland* test and its related precedent offer persuasive, though not controlling, legal authority. *See Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338, 343 & n.8 (Tex. 2007) (noting that Fifth Circuit precedent is persuasive but not binding on this Court) (citing *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993)). The test is founded on deference to the Attorneys General's interpretations of the Act, which are likewise persuasive but not controlling. *See City of Dall.*, 304 S.W.3d at 384. The Court complains that the *Kneeland* test has a "questionable foundation," noting that even the *Kneeland* court acknowledged that its explanation of its holding was "a mite uncertain." *Ante* at ___ (quoting *Kneeland*, 850 F.2d at 224). But as the Court notes, it is the "direction given" in *Kneeland* that the court described as "uncertain," not the "foundation" on which the court relied. Although the court acknowledged that its description of the test was less than clear, "[o]ne may have no quarrel with the formulae" it adopted. *Kneeland*, 850 F.2d at 228. I would take this opportunity to clarify the *Kneeland* test by articulating three basic requirements for determining whether a private entity that provides services to or for the government and is paid with public funds is "supported in whole or part by public funds" and is thus a governmental body under the Act.

### a. Receipt of Public Funds

First, to be "supported by" public funds, a private entity must at least "receive" public funds, so an entity that does not receive public funds is not a governmental body under this provision. Thus, while the Attorney General was cognizant in JM-821 that the role of a volunteer fire department is one "traditionally provided by governmental bodies," this fact, standing alone,

is not enough. *See* Tex. Att'y Gen. Op. No. JM-821. Arguably, at least, the private high school in JM-154, the water supply corporation in JM-596, and the Fiesta planning commission in ORD-569 also provided services "traditionally provided by governmental bodies." *See* Tex. Att'y Gen. ORD-569; Tex. Att'y Gen. Op. Nos. JM-154, JM-596. But because they did not receive public funds, they were not governmental bodies under part (xii). *See* TEX. GOV'T CODE § 552.003(1)(A)(xii). As the Attorney General recognized, "[t]he threshold question is whether the [private entity] receives any funds from the [public fisc]." Tex. Att'y Gen. ORD-569; *see also* Tex. Att'y Gen. OR2013-09038 (determining that El Paso Zoological Society that received no public funds was not a governmental body).

### b. Support, Not Consideration

Everyone agrees, however, that merely "receiving" public funds does not equate to being "supported by" those funds. Governmental entities regularly purchase a wide variety of goods and services from private vendors, including everything from legal pads to legal services, and I agree that such vendors are generally not "supported . . . by public funds" as a result of such transactions, at least as the Act uses that term. Thus, a private entity that receives public funds in exchange for assuming an "obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser" is not "supported by" those public funds, and is not a governmental body under the Act. *CareFlite v. Rural Hill Emergency Med. Servs., Inc.*, 418 S.W.3d 132, 141–42 (Tex. App.—Eastland 2012, no pet.) (holding that medical service provider was not a governmental body); *see also Hart*, 382 S.W.3d at 595 (holding that association of appraisal districts was not a governmental body).

A second requirement for a private entity to be "supported . . . by public funds," then, should be that the private entity must receive public funds not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities. *See* Tex. Att'y Gen. Op. No. GA-666; *compare* Tex. Att'y Gen. ORD-228 (concluding that commission was governmental body because it received public funds "used for [its] general support"); Tex. Att'y Gen. ORD-302 (concluding that promoter of manufacturing and industrial development was governmental body because it was provided "unrestricted" grant of public funds); Tex. Att'y Gen. Op. No. JM-116 (concluding that athletic association was governmental body because it was provided public funds to be "used for [its] 'general support . . . rather than being attributable to specific payments for specific measurable services'"), *with* Tex. Att'y Gen. ORD-343 (concluding that ambulance service provider was not governmental body because it was paid specific amounts to cover specific, measurable services provided under service contract).

This requirement would most easily be met when a governmental entity provides a "grant" to promote the private entity's activities, but it may also be met when the governmental entity "pays" the private entity to provide services to or for the governmental entity or its constituents. The terminology that the parties choose to use should not be determinative. A key factor in the context of a service contract like those at issue here would be whether the relationship between the service provider and the governmental entity is the kind of "*quid pro quo*" relationship common in the service industry, *see Kneeland*, 850 F.2d at 230, or whether the relationship is something more akin to a governmental body outsourcing governmental services to a private entity, *see* Tex. Att'y Gen. ORD-228, ORD-302; *see also Hart*, 382 S.W.3d at 595

(observing that association of appraisal districts did not perform services traditionally performed by governmental bodies and instead provided services under conditions similar to what would be expected in typical arm's-length transaction).

In this context, I note that the Attorney General's ruling here should have come as no surprise to the Partnership, as Attorneys General have repeatedly concluded that chambers of commerce, *see* Tex. Att'y Gen. Nos. ORD-621 (Arlington Chamber of Commerce), OR2001-4849 (Round Rock Chamber of Commerce), chambers-of-commerce-like entities, *see* Tex. Att'y Gen. ORD-228 (entity chartered to promote interest of Dallas-Fort Worth metropolitan area), ORD-302 (entity promoting manufacturing and industrial development around City of Bryan), and even the Partnership itself, *see* Tex. Att'y Gen. OR2004-4221, are governmental bodies under the Act. But these conclusions are based on a "fact-specific" analysis of the contract and context of each case. *See Kneeland*, 850 F.2d at 228; *see also CareFlite*, 418 S.W.3d at 138 ("The answer to the [governmental-body] inquiry depends upon the circumstances of each case."). As the Attorney General has confirmed, a chamber of commerce that is not "supported in whole or in part by public funds" is not a governmental body under the Act. *See* Tex. Att'y Gen. OR2015-05495 (2015) (finding Central Fort Bend Chamber of Commerce is not governmental body because it only received public funds as membership fees paid for specific measurable services).

With regard to this second requirement, I would not dictate that the public funds equal a particular amount or percentage of the entity's total revenue, nor would I mandate that the entity require those funds for its existence or survival. The Act defines "governmental body" to include "the part, section, or portion" of an entity that is "supported in whole or in part by public funds."

TEX. GOV'T CODE § 552.003(1)(A)(xii). Thus, public funds could make up only a small portion of an entity's total revenues and yet provide general support, and even the sole support, for a particular part, section, or portion of the entity, or support "in part" of the entity as a whole. *See* Tex. Att'y Gen. ORD-602 (holding that city provided general support to museum even though public funds constituted only 15% of total revenue, but only portion of museum that received "direct support" was a governmental body). Under this construction of the Act, that part, section, or portion of the entity is a governmental body under the Act, even if the rest of the entity is not. *See id.* In short, because the statute includes the "part, section, or portion" of entities that are supported "in part" by public funds, it is the nature of the public funds (as support or sustenance and not as compensation or consideration), and not the amount or percentage of the public funds, that matters.

### c. A Shared Common Purpose

Finally, to ensure that the funds are received as a general or unrestricted payment to subsidize or underwrite the private entity's activities, a third requirement should be that the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue even in the absence of their contractual relationship. The mere existence of an "agency-type relationship" or a "common purpose or objective," or even the fact that the service is one "traditionally provided by governmental bodies," should not be sufficient by itself to meet this third requirement. *See* Tex. Att'y Gen. Op. No. GA-666; *Kneeland*, 850 F.2d at 228–29.[12] It is not unusual for an arms-length services vendor to take on an agency-type

---

[12] *See also CareFlite*, 418 S.W.3d at 142 ("[W]e have not found[] any authority, primary or persuasive, that stands for the proposition that, if a private entity and a governmental body share a common purpose or objective, the

role for its customer, or for a governmental agency to enter into an arms-length contract for government services that the agency itself traditionally provides, and contracting parties will ordinarily share at least the common objective of effectuating the obligations and purposes of their contract. In ORD-343, for example, the Amarillo Hospital District and its ambulance service provider shared the common goal of the contract: providing the people of Amarillo with emergency transportation to local hospitals. *See* Tex. Att'y Gen. ORD-343. But such relationships do not necessarily result in the governmental body "supporting" the private entity.

Instead, I would hold that a supportive relationship exists when the parties share a true "identity of interests" that each of them has beyond any particular transaction or finite series of transactions between them. *See Kneeland*, 850 F.2d at 228–29 ("[T]here apparently is some common purpose or objective between the association and the universities, or they would not be drawn to each other, but there is no real identity of interest and neither may be considered the agent of the other."). The volunteer fire department in JM-821 provides an example of this more extensive "identity of interests" relationship. *See* Tex. Att'y Gen. Op. No. JM-821. There, the private entity and the governmental entity each independently had the purpose of protecting citizens and property from fires and other hazards, and the governmental entity promoted the private entity's pursuit of that purpose by providing "general support." *See id.*

I would thus distinguish between (1) a situation in which a private entity contractually undertakes a governmental entity's objectives because the governmental entity agrees to pay for those services, and (2) a situation in which a private entity and a governmental entity that each

private entity is automatically a governmental body for purposes of the [Act]. Neither are we aware of any like authority when an entity provides services traditionally provided by governmental bodies.").

independently have the same purpose or interest, and thus an "identity of interest," contractually agree to pursue that interest in cooperation and using public funding. *See Kneeland*, 850 F.2d at 228–29. For example, when a governmental entity hires a law firm to represent it in litigation, the firm and the government share interests and objectives specific to the firm's representation of that entity, but they do not necessarily have an "identity of interests." Although both the firm and the client may desire and jointly pursue the same outcome from the representation, the firm's interest in achieving that outcome is transaction specific: the law firm takes on that goal because the client pays it to do so, and but for the client-attorney relationship, the law firm generally has no stake in the outcome of the litigation.[13]

In summary, then, I would clarify the *Kneeland* test and hold that a private entity (or a part, section, or portion thereof) is "supported in whole or in part by public funds," and is thus a governmental body under the Public Information Act, if (1) the private entity receives public funds; (2) it does so not as compensation or consideration made in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities; and (3) the funds provided are intended to promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship.

---

[13] Contrary to the Court's concern, this distinction would apply as effectively when the government contracts with a private firm to "provide more enduring and wide-ranging counsel" as it would when it hires a firm to handle a specific matter. *See ante* at ___. In either case, the third requirement (common purpose) typically would not be met because it is not part of the law firm's mission or purpose to achieve the specific objectives that the government hires it to achieve, other than to fulfill its obligation to its client. But if the government paid funds to a special interest firm whose mission as a firm was to protect the environment, or promote a pro-life agenda, or increase health care for children, for example, this third requirement might be satisfied if the purpose of the government's payment was to "support" the firm's efforts to accomplish that mission. If the second requirement were also satisfied (i.e., the government paid the funds to subsidize or underwrite the firm's efforts, rather than as consideration for specific, measurable services), the firm would be a governmental body under the Act.

**III.**
**Application to the Partnership**

The Partnership, which undisputedly received public funds, asserts that its agreements with the City were arm's-length, *quid pro quo* contracts that only obligated it to perform specific and measurable services. The Attorney General disagrees, contending that the Partnership was "paid a certain amount of money on a quarterly basis to accomplish a broad range of goals designed to promote the City." The Court agrees with the Partnership. Under the facts of this record, I would conclude that the Partnership meets all three requirements for being "supported . . . by public funds."

**A.      Payments to Subsidize the Partnership's Activities**

The parties do not dispute, and I agree, that some of the provisions in the Partnership's contracts with the City imposed specific and definite obligations on the Partnership to provide a measurable amount of service. The court of appeals also agreed, but found that the Partnership's "major obligations under the contract are not specific, definite, or tied to a measurable amount of service for a certain amount of money." 407 S.W.3d at 784. The court provided these examples of the Partnership's indefinite obligations to:

- [i]dentify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business;

- partner with the airport system to recruit, relocate, and expand business which supports the master plan, and to identify business incentives available in both public and private sectors;

- make its research capabilities available to the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau for marketing reports;

41

- support and coordinate with HAS to develop new air routes, stimulate increased international trade and business for Houston companies;

- promote HAS stories in international markets and highlight HAS efforts to provide airports allowance for expansion and ease of transportation;

- "coordinate on matters of mutual interest" before the U.S. Congress, federal agencies, the Texas Legislature, and Texas agencies; and

- assist the City of Houston's mayor, should she ask for help, with "advancing various Economic Development and Marketing Initiatives."

*Id.* at 784. In light of these provisions, the court of appeals concluded that it could not "say that overall the contract here imposes specific and definite obligations on [the Partnership] to provide a measurable amount of services to the City of Houston in exchange for a certain amount of money, as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.*

The Partnership contends, and the Court apparently agrees, that its contractually mandated performance reports provide the missing specifics for the broader obligations on which the court of appeals relied. The Partnership also asserts that some of its contractual obligations are necessarily vague because "in the context of intangible deliverables it would be nearly impossible to provide greater details." For example, the contracts require the Partnership to "make its research capabilities available on request to" the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau "to facilitate the creation of professional, sophisticated marketing reports," but the City cannot predict all of the groups that might approach it during the course of a year with an interest in the convention center. The Partnership also takes issue with the court of appeals' observation that the Partnership does not perform its obligations "in exchange for a certain amount of money," as the

Partnership is paid a set amount on a quarterly basis "regardless of whether or how much it does in furtherance of the contract's goals." According to the Partnership, "this observation fails to acknowledge or appreciate that all payments under the contracts are made 'in arrears and are contingent upon receipt and approval'" of the Partnership's performance reports.

I agree with the court of appeals that while some of the services the Partnership provides under the contracts are specific and measurable, the major obligations are broad and open-ended. Although the performance reports may identify specific services that the Partnership performed in fulfilling those general promises, these after-the-fact reports of services the Partnership decided to provide do not impose a contractual obligation on the Partnership to provide those specific services. And although the contracts provide that the City's quarterly payments to the Partnership are "contingent upon receipt and approval by the Director of [the] written progress reports in accordance with Article III(C)," that article merely authorizes the Director to require reports and to determine their format and content; it does not authorize the Director to dictate what services must be provided or included in the report or otherwise narrow the Partnership's broad discretion to decide the types and amounts of services to provide. Finally, the fact that it might be difficult or impossible for the contracts to provide greater detail about some of the "intangible deliverables" does not weigh in favor of treating those provisions as if they called for "specific, measurable services" when they do not. In ORD-602, the Attorney General recognized that the "highly specialized, unique services" the museum provided to the City of Dallas could not be "known, specific, or measurable," but the Attorney General still concluded that the museum was, in part, a governmental body under the Act. *See* Tex. Att'y Gen. ORD-602 (1992).

43

As the court of appeals pointed out, the contracts at issue do not tie the City's payments to the Partnership to discrete services or measurable amounts of service. Instead, the City paid the Partnership a flat fee of $196,250 per quarter, regardless of whether, or how, or how extensively the Partnership made efforts to "identify new business opportunities, secure economic incentives, and increase outreach and recruitment activities to the region's targeted key industries to strengthen Houston as a competitive place to do business." The absence of an identifiable link between the services provided and the payment due, when considered in conjunction with the lack of specificity and measurability in many of the contract's service requirements, demonstrates that the City paid the Partnership public funds to subsidize, underwrite, and support the Partnership's activities.

It is true that public funds make up only a small "part" of the Partnership's support. But when an entity, or "part, section, or portion" of an entity, receives public funds for its general support, the entity has broad discretion to use those funds as it sees fit to accomplish its goals, and the entity shares those goals with a public entity that would otherwise use the funds to accomplish those goals itself, the entity, or that "part, section, or portion" of the entity, is "supported in whole or in part by public funds." This does not mean that the public has a right to know how the Partnership spends all of its funds, but the Partnership has made a tactical decision here not to provide information about where the public funds go within the Partnership or how the public funds are spent, so that we could limit its duty to produce records under the Act to "records concerning its *operations that are directly supported by governmental bodies*," as the Attorney General has done for the Partnership in the past. *See* Tex. Att'y Gen. OR2004-4221 (emphasis added).

Finally, as noted, the 2008 services agreement included language specifying that the City's funds were "solely for services rendered under this Agreement and are not intended to support [the Partnership] in any of its activities not specifically set forth in this Agreement." But the determination of this issue must depend on the actual nature of the services and payment obligations under the contract. The 2008 contract's conclusory statements that the contract does not render the Partnership a governmental body and that the contract payments are not for general support do not make it so. Just as a governmental body cannot avoid the Act's requirements by promulgating rules, *see Indus. Found. of the S.*, 540 S.W.2d at 677, it cannot do so by contractually agreeing that the Act does not apply. Otherwise, every entity contracting with the government would shield itself from the Act simply by stating in the contract that it is not a governmental body. In light of the broad, open-ended services the Partnership agreed to perform under these contracts, I would conclude that the second requirement is met.

## B.      Identity of Interests

I now consider whether the City's funds were intended to promote a purpose, interest, or mission that the City and the Partnership share and would each pursue even in the absence of their contractual relationship. The evidence here readily establishes that this requirement is met. Independent from any contract with the City, the Partnership exists to promote job creation, increased trade, and capital investment in the greater Houston area. As the Court agrees, even without the City's contract, the Partnership "could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members." *Ante* at ___. The City contracted with the Partnership because the City independently shares those same interests. The City did not pay the Partnership to provide services merely to

45

promote the City's individual objectives, but to promote objectives that the City and the Partnership share. In fact, the contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan." (Emphasis added.) The interest the City and Partnership share does not arise solely out of the parties' contractual relationship—both parties independently share these objectives. The City has an inherent motive to promote its own financial interests, and promotion of the City's economic development was a primary focus of the Partnership's purpose.

Under these circumstances, I would hold that the Partnership was "supported in whole or in part by public funds" so as to fall within the definition of a "governmental body" under the Public Information Act. *See* TEX. GOV'T CODE § 552.003(1)(A)(xii).

## IV.
## Policymaking

Although the Court acknowledges the Act's instruction that we construe it liberally in favor of a request for information, *see id.* § 552.001(b), the Court chooses to adopt the most narrow construction of "supported" possible, because a broader construction would permit "public intrusion into the private affairs of non-governmental entities," *ante* at __, "pry open the sensitive records of private entities," *ante* at __ n.12, and subject the Partnership to "invasive disclosure requirements," *ante* at __. Even if we could construe the Act according to our preferred results rather than the text of the statute (which we cannot, or at least, should not), I find the Court's concerns to be not nearly as troubling as the Court suggests.

What the Court fails to acknowledge is that the Act protects the Partnership's "sensitive records," but the Partnership elected not to seek that protection. The Act expressly excepts from disclosure all information that is "confidential by law, either constitutional, statutory, or by

judicial decision." TEX. GOV'T CODE § 552.101. Even if the information is not confidential by law, the Act still excepts it from disclosure if, for example, it constitutes the Partnership's commercial or financial information and (as the Court assumes) its disclosure would cause the Partnership "substantial competitive harm." *Id.* § 552.110(b). In fact, as the Court recently held, the Act excepts the information if its release would even just "give advantage to a competitor." *See Boeing Co. v. Paxton*, No. 12-1007, ___ S.W.3d ___, ___ (Tex. June 19, 2015) (construing TEX. GOV'T CODE § 552.104). And particularly apropos to the Partnership's activities, the Act specifically excepts certain "information [that] relates to economic development negotiations involving a governmental body and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body." TEX. GOV'T CODE § 552.131(a). The Partnership did not assert any of these exceptions in this appeal. In fact, it did not assert any exceptions at all, even though it has successfully asserted exceptions in the past. *See* Tex. Att'y Gen. OR2004-4221. Nor did it ever contend that only a "part, section, or portion" of the Partnership is supported by public funds, even though it successfully made that assertion in the past as well. *See id.*

The Partnership contends that the court of appeals' decision represents a "vast overexpansion of the Public Information Act to reach private business information that the public has no inherent or legitimate right to know." In response, the Attorney General asserts that the Partnership's construction of the statute would permit governmental bodies to evade public scrutiny by contracting with private entities to carry out government business. "If governmental bodies can shield information from public scrutiny by outsourcing their business to private companies," the Attorney General contends, "the purpose of the [Act] is frustrated." In short,

each party warns that the other's proposed construction will have dire consequences, either destroying private entities' ability to keep their private information private or undermining the people's right to know what their government is doing. The Partnership asserts, "The stakes are tremendous."[14]

I am not convinced that the effect of our determination would or must be as drastic as either party, or the Court, suggests. Although the Court concludes that the Partnership is not a governmental body, the Act still empowers the public to require the City to disclose all "information that is written, produced, collected, assembled, or maintained" by or for the City "under a law or ordinance or in connection with the transaction of official business." TEX. GOV'T CODE § 552.002(a)(1) (defining "public information"). This extends to not only the City's service agreements with the Partnership and all reports and other information the Partnership provided to the City under those contracts, but also all information the Partnership collects, assembles, or maintains for the City "in connection with the transaction of official business," if the City "owns," "has a right of access to," or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information." *Id.* § 552.002(a). Even if the requested information is not in the City's actual possession, the Act still provides broad access to the Partnership's information related to "the transaction of official business." *Id.*

---

[14] We have also received amicus briefs from several chambers of commerce arguing that the court of appeals' holding, if allowed to stand, will be "catastrophic" for chambers of commerce in Texas and will render them "wholly unable to function."

Conversely, if the Court concluded, as I do, that the Partnership is a governmental body, the Partnership could still protect its confidential and commercially sensitive information by relying on the Act's numerous exceptions. In addition, the Partnership could assert (as it has previously asserted), that only a particular "part, section, or portion" of the Partnership is supported in whole or in part by public funds, and only that "part, section, or portion" is required to disclose information in response to a public information request. *See id.* § 552.003(1)(A)(xii); *see also* Tex. Att'y Gen. OR2004-4221 (concluding that "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information") (emphasis added). In its appeal to this Court, however, the Partnership does not assert any exceptions, does not contend that only a particular "part, section, or portion" of the Partnership was supported by public funds, and has made no other effort to protect the information in its check registers, other than to claim it is not a governmental body. It is a risky litigation strategy, and the Court should not let it motivate us to misinterpret the Act for fear that the Partnership's confidential financial information would otherwise be disclosed.

In any event, regardless of whether the effects will be as drastic as the Court, the Partnership, or the Attorney General suggest, our job is to interpret and apply the statute as written, not to rewrite it to achieve the policy outcomes they or we may prefer. *See In re Tex. Dep't of Family & Protective Servs.*, 210 S.W.3d 609, 614 (Tex. 2006) ("It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written.") (citation omitted).[15]

---

[15] *See also F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 690 (Tex. 2007) ("[W]e do not pick and choose among policy options on which the Legislature has spoken. 'Our role . . . is not to second-guess the

# V.
## Conclusion

I would hold that the Greater Houston Partnership was supported in whole or in part by public funds and would thus agree with the Attorney General, the trial court, and the court of appeals that the Partnership is a governmental body for purposes of Jenkins's public information requests. The Partnership has not argued that only a particular "part, section, or portion" of the Partnership received public funds, or that any of the information at issue falls within one of the Act's exceptions to required disclosure. I would therefore affirm the court of appeals' judgment requiring the Partnership to disclose its 2007 and 2008 check registers pursuant to the Public Information Act.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 26, 2015

---

policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent.'") (quoting *McIntyre v. Ramirez*, 109 S.W.3d 741, 748 (Tex. 2003)) (alteration in *F.F.P. Operating Partners*, 237 S.W.3d at 690).