**Opinion issued January 14, 2021**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00980-CV

_____

**SHANNON MCCLARY AND TINA MCCLARY, Appellants**

**V.**

**HARVEST FUELS, LLC, Appellee**

On Appeal from the 344th District Court
Chambers County, Texas
Trial Court Case No. 19-DCV-0367

## MEMORANDUM OPINION

This is an accelerated interlocutory appeal from the trial court's order denying two special appearances. The underlying dispute arises from three trade agreements for the sale and delivery of blendstock fuel product for processing at a reclamation plant in Texas. Under the trade agreements, a Texas fuel trader,

Harvest Fuels, LLC, agreed to sell and deliver the blendstock to McClary Transport—an entity purportedly owned by Oklahoma residents Shannon and Tina McClary but not formed under the laws of any state and not registered to do business in Texas. When McClary Transport failed to fully pay for the delivered blendstock, Harvest Fuels sued the McClarys in their individual capacities. The McClarys then filed special appearances, which the trial court denied.

On appeal, the McClarys argue that the trial court erred in denying their special appearances because (1) the trade agreements violate Railroad Commission Statewide Rule 3.1 and are therefore void, (2) the McClarys did not establish minimum Texas contacts necessary to support the exercise of jurisdiction over them in their individual capacities, and (3) there is legally and factually insufficient evidence for various findings of facts made by the trial court in support of its rulings. We hold that (1) the trade agreement's compliance with Statewide Rule 3.1 is irrelevant to our jurisdictional analysis, and the trade agreements, in any event, comply with the rule, (2) the McClarys established minimum contacts by acting on behalf of Harvest Transport, a fictitious entity for whom they are personally liable, and (3) the trial court's challenged findings of facts are supported by legally and factually sufficient evidence.

Therefore, we affirm.

**Factual Background**

In this interlocutory appeal, the underlying dispute arises from three trade agreements under which a Texas fuel trader, Harvest Fuels, LLC, agreed to sell and deliver blendstock fuel product to a nonresident buyer that is owned and operated by nonresident individuals, Shannon and Tina McClary, but does business in Texas. The principal factual dispute concerns the identity of this buyer. The McClarys contend the buyer was McClary Energy, LLC, an entity formed under Oklahoma law and registered to do business in Texas. Harvest Fuels contends the buyer was McClary Transport, a fictitious entity and mere pseudonym for the McClarys in their individual capacities. The following narrative focuses on the facts relevant to the resolution of this dispute. We begin with a brief introduction to the parties.

The appellants are Shannon and Tina McClary, a married couple who reside in Cameron, Oklahoma, but own property in Anahuac, Texas. The McClarys lease this property to their business, McClary Energy, LLC. There, McClary Energy operates a fuel reclamation plant, which mixes tank bottoms and other hydrocarbon wastes with fuel blendstocks to produce reusable oil. McClary Energy possesses a non-transferable permit to operate the reclamation plant, which was issued by the Texas Railroad Commission under Statewide Rule 57. A signboard at the entrance

to the property identifies the plant as a permitted reclamation facility. It states, in large bold print:

> **McCLARY ENERGY LLC.**
> **TEXAS RAILROAD COMMISSION RECLAMATION FACILITY**
> **PERMIT NO. R903-1603**
> **OPERATOR NO. 540182**
> **Emergency 911**

In addition to McClary Energy, the McClarys own two other entities, McClary Trucking, Inc. and Interstate Energy, LLC. Like McClary Energy, these two entities were formed under Oklahoma law and are registered to do business in Texas. Further, and as discussed below, there is evidence that the McClarys have also done business under the name of two fictitious entities, McClary Transport and McClary Oil.

The appellee in this appeal is Harvest Fuels, LLC, a limited liability company formed under Texas law and headquartered in The Woodlands, Texas. Harvest Fuels is a fuel trader that procures, blends, and processes hydrocarbon wastes and other petrochemical products, which it then sells to reclamation plants and similar entities. Harvest Fuels is owned by Marlon Williams, who serves as the company's president.

### *The parties enter into the first trade agreement*

In the fall of 2018, Marlon Williams, on behalf of Harvest Fuels, contacted Shannon McClary and offered to begin selling tank bottoms and blendstock to

4

Shannon's business. Shannon agreed, and the two proceeded to negotiate the terms of their first trade agreement over the phone. These terms included the buyer; the seller; the type, quality, and quantity of product; the method, address, and date of delivery; and the price and method of payment. The parties dispute who they agreed the buyer would be. On the one hand, Marlon contends that Shannon told him to list the buyer as "McClary Transport" and that, when he asked Shannon whether he should include any corporate suffix, such as LLC, Shannon responded that the buyer was "just McClary Transport." On the other hand, Shannon contends that he made clear that the buyer would be McClary Energy and that in negotiating the agreement he was acting on behalf of McClary Energy alone.

When they were done negotiating, Marlon sent Shannon an email, dated October 1, 2018, to confirm and memorialize the terms of the agreement. The email's subject line was "Trade Agreement." It stated:

Shannon,

As per our conversation, here is the trade agreement for the product currently being delivered. It is my understanding 4 loads have been completed and we will finish the remainder this week. Thanks,

Seller:              Harvest Fuels LLC
Buyer:              Mcclary Transport
Product:            Light blendstock
Quality:            Specs attached
Quantity:           Approx. 1200 bbls (8 trucks)
Deliver Terms:      Delivered by truck to Mcclary's tanks (309 South FM1724 anawack, tx, 77514)
Pricing Terms:      $30.00/barrel Flat

5

| | |
|---|---|
| Payment Terms: | Crude terms |
| Delivery Window: | 09/27/18-10/05/18 |

Attached to the email was a Certificate of Analysis from a third-party laboratory certifying the quality of the light blendstock. After receiving Marlon's email, Shannon responded, "Looks Good." Shannon did not object to any of the terms, including the buyer.

Harvest Fuels then delivered the blendstock to "Mcclary's tanks" as agreed. The shipping invoices and bills of lading listed the consignee and recipient of the blendstock variously as "McClary Oil" and "McClary Oil Co." located at "309 South FN 1724 Anahuac, TX 77514."

***The parties enter into the second trade agreement***

Later that month, Marlon and Shannon entered into a second trade agreement. As before, they first negotiated the terms over the phone. And when they were done negotiating, Marlon sent Shannon an email, dated October 22, 2018, to confirm and memorialize the terms of the agreement. The email's subject line was "Light blendstock." It stated:

> Shannon,
>
> As discussed, we will send you 2 loads of light blendstock (dms-145 lights). Trade agreement below. Also, I'm resending our wiring info for our September payment. Please send over the correlating load report.
>
> | | |
> |---|---|
> | Seller: | Harvest Fuels |
> | Buyer: | Mcclary Transport |

6

Product:                       Light Blendstock (dms-145 lights)
Quality:                      Specs attached
Quantity:                    Approx. 350 bbls (2 trucks)
Delivery Terms:         Delivered by truck to Mcclary's tanks (309 South FM1724 anawack tx, 77514)
Pricing Terms:          Platts WTI minus $6.00 per barrel
Payment Terms:        Crude terms
Delivery Date:          10/22/18

Please wire payment to:

Harvest Fuels, LLC
c/o Wells Fargo, Houston, TX
Routing: --------
Account: --------

Attached to the email was another Certificate of Analysis certifying the quality of the light blendstock. Shannon responded to the email without objecting to any of the terms, and Harvest Fuels delivered the blendstock as agreed. The shipping invoices and bills of lading again listed the consignee and recipient as either "McClary Oil" or "McClary Oil Co."

***Harvest Fuels receives partial payment***

On October 23, 2018, Harvest Fuels received a wire transfer from Interstate Energy, LLC. The transfer was made to Harvest Fuels' bank account in Houston, Texas. Harvest Fuels determined the transfer was payment for the first trade agreement since the amount received matched the amount owed under the agreement. Harvest Fuels later confirmed that Interstate Energy is an Oklahoma limited liability company owned and operated by Shannon McClary.

7

On November 21 and December 21, Harvest Fuels received two additional wire transfers from Interstate Energy. As before, the transfers were made to Harvest Fuels' Houston bank account. The amounts received did not cover the entire amount due under the second trade agreement.

***The parties enter into the third trade agreement***

In late December 2018, Marlon and Shannon entered into a third trade agreement. They followed the same process as before. Marlon and Shannon first negotiated the terms over the phone, and then Marlon sent Shannon an email, dated December 27, 2018, to confirm and memorialize the terms of the agreement. The email's subject line was "Trade agreement Diesel lightblendstock." It stated:

> Shannon,
>
> As per our conversation, here is the trade agreement for the 11,500 barrels diesel/light blendstock mix. Specs attached. This is in addition to all of our regular loads already scheduled. Also, Please send the run sheet for Last month's payment.
>
> | | |
> |---|---|
> | Seller: | Harvest Fuels LLC |
> | Buyer: | Mcclary Transport |
> | Product: | Diesel/Light blendstock |
> | Quality: | Specs attached |
> | Quantity: | Approx. 11,500 bbls (70 trucks) |
> | Delivery Terms: | (4 trucks/day) Delivered by truck to Mcclary's tanks (309 South FM1724 anawack tx, 77514) |
> | Pricing Terms: | Platts WTI minus $8.00 per barrel |
> | Payment Terms: | Crude terms |
> | Delivery Window: | 01/02/19-01/30/19 |

Attached to the email was a Report of Analysis certifying the quality of the light blendstock. Shannon did not object to any of the terms in the email, and Harvest Fuels delivered the blendstock as agreed. The shipping invoices and bills of lading again listed the consignee and recipient as either "McClary Oil" or "McClary Oil Co."

***Harvest Fuels receives partial payment for the second and third trade agreements***

After Harvest Fuels delivered the blendstock under the third trade agreement, Harvest Fuels received two additional wire transfers from Interstate Energy, one on December 31, 2018, and one on January 23, 2019. Both were made to Harvest Fuels' Houston bank account. The amounts received did not cover the amount still owing under the second and third trade agreements.

***Harvest Fuels demands payment for the total amount due, but the McClarys refuse***

In January 2019, Harvest Fuels notified the McClarys that payment for the delivered product was "significantly short" and provided an accounting of the loads and volumes that Harvest Fuels had delivered, along with a calculation of the total amount owed. The McClarys then claimed that certain loads of blendstock delivered by Harvest Fuels did not meet the quality specifications of the trade agreements. Harvest Fuels investigated the claim and concluded the blendstock had

9

in fact met the specifications. The parties attempted to negotiate a reduced price to resolve the dispute but were unsuccessful.

In March 2019, Harvest Fuels made a demand for payment on Shannon McClary and Tina McClary d/b/a McClary Transport. The McClarys did not make the demanded payment, and Harvest Fuels filed suit.

## Procedural History

In May 2019, Harvest Fuels filed its original petition against Shannon and Tina McClary d/b/a McClary Transport and McClary Oil Company, asserting a single claim for breach of contract. In response, the McClarys filed special appearances, arguing that they are not amenable to process because they reside in Oklahoma (not Texas) and have not conducted business in Texas or otherwise established minimum contacts with the state in their individual capacities. Extensive briefing followed.

Harvest Fuels filed a brief in opposition to the McClarys' special appearances, asserting that the McClarys' Texas contacts were made on behalf of McClary Transport and McClary Oil Company, fictitious entities and mere pseudonyms for the McClarys themselves. Harvest Fuels argued that because the McClarys' contacts were made on behalf of fictitious entities, the McClarys assumed personal liability for the trade agreements.

10

The McClarys then filed supplemental special appearances and a reply to Harvest Fuels' brief, asserting that their contacts were made on behalf of McClary Energy, not McClary Transport or McClary Oil Company. The McClarys alleged that Harvest Fuels was aware they were acting on behalf of McClary Energy because they had informed Marlon of this at the outset of the parties' relationship. The McClarys further argued that, to the extent they acted on behalf of McClary Transport as Harvest Fuels alleged, the trade agreements were illegal and void because Texas law—specifically, Railroad Commission Statewide Rule 3.1.—prohibited Harvest Fuels from selling blendstock to them in their individual capacities, as they lacked the requisite permits. Finally, the McClarys argued that Tina had not established minimum contacts, as she never communicated with anyone from Harvest Fuels and was not meaningfully involved in the performance of the agreements.

Harvest Fuels filed a sur-reply to the McClarys' supplemental special appearances and reply, asserting that the unambiguous terms of the written trade agreements and other documents relating to the deliveries of the blendstock demonstrated that the McClarys conducted business as McClary Transport and McClary Oil Company, not McClary Energy. Harvest Fuels further asserted that the McClarys had misconstrued Rule 3.1, which, according to Harvest Fuels, prohibited the McClarys from reclaiming blendstock, but not from purchasing it.

11

Finally, Harvest Fuels asserted that Tina was actively involved in the performance of the trade agreements, as evidenced by numerous emails in which she directed the delivery of the loads of blendstock, recorded the loads delivered, requested additional loads, and authorized payment.

Harvest Fuels filed its second amended petition against the McClarys. The petition made new jurisdictional allegations, raising three separate but related theories of jurisdiction: (1) that the McClarys acted as agents of the fictitious entities McClary Transport and McClary Oil Company, (2) that the McClarys acted under the assumed names of McClary Transport or McClary Oil Company, and (3) that the McClarys acted as the general partners of a de facto partnership doing business as McClary Transport and McClary Oil Company. The petition also asserted two new claims, one for a suit on a sworn account and one for negligent misrepresentation, the latter of which was asserted in the alternative in the event the trial court found no contract exists between Harvest Fuels and the McClarys individually.

The McClarys filed substantively identical declarations in support of their special appearances. In the declarations, Shannon and Tina stated that they had never done any business in Texas, never done business in their individual capacities, and never done business under the name McClary Transport or McClary Oil Company. They stated that all their Texas contacts relating to the

trade agreements were made on behalf of McClary Energy. And they stated that it was their "understanding" that it was unlawful to sell blendstock and tank bottoms to anyone who "does not have a permit to reclaim oilfield related hydrocarbons issued by the Texas Railroad Commission." Harvest Fuels filed objections to the McClarys' declarations, arguing that their statements were either conclusory or inadmissible parol evidence.

The McClarys filed additional evidence in support of their special appearances. The evidence consisted of two emails, dated October 23, 2018, and November 2, 2018, from McClary Energy employee Brittani Cooper to Marlon Williams. The first email contained Cooper's signature line, which indicated that she worked for "McClary Energy LLC." The second email included an attached "Price Matrix for McClary Energy LLC."

In November 2019, the trial court held a hearing on the McClarys' special appearances. The trial court overruled Harvest Fuels' objections to the McClarys' declarations but ultimately denied the McClarys' special appearances. The trial court later made written findings of fact and conclusions of law in support of its order. The trial court found that:

- Harvest Fuels and Shannon and Tina McClary, doing business as "McClary Transport," entered into three trade agreements for the purchase and delivery of blendstock fuel.

- The trade agreements were dated (1) October 1, 2018, (2) October 22, 2018, and (3) December 27, 2018.

- Marlon telephonically negotiated the terms of the trade agreements with Shannon and then confirmed the negotiated terms through email correspondence.

- Shannon affirmatively confirmed the terms of the first trade agreement in an email. Neither Shannon nor Tina provided Harvest Fuels any oral or written notice of objection to the terms of the second and third trade agreements.

- Each trade agreement identified the seller as "Harvest Fuels LLC" and the buyer as "McClary Transport."

- Shannon and Tina conducted business with Harvest Fuels as "McClary Transport."

- McClary Transport is not organized under the laws of Texas or any other state, is not registered to do business in Texas or in any other state, and has no registered agent for service of process in Texas or in any other state.

- Each trade agreement contained a delivery term that required the product to be delivered to "McClary's tanks" located at "309 South FM 1724 anawack, tx, 77514."

- Each trade agreement required payment to be wired to Harvest Fuels' bank account located in Houston, Texas.

- Harvest Fuels delivered the product to the McClarys' tanks in Anahuac, Texas.

- The shipping records that document the transport and delivery of the product to the McClarys' tanks identify the consignee as "McClary Oil" located at "309 South FM 1724, Anahuac, TX."

- McClary Oil is not organized under the laws of Texas or any other state, is not registered to do business in Texas or in any other state, and has no registered agent for service of process in Texas or in any other state.

- Tina and Shannon regularly communicated with Harvest Fuels from December 2018 to February 2019 regarding the trade agreements.

14

- Tina and Shannon regularly provided instruction to Harvest Fuels from December 2018 to February 2019 regarding the shipments of blendstock, calculation of final price, and invoicing and payment for the shipments.

- Shannon exchanged email communications with Harvest Fuels using the email address smcclary@windstream.net, and Tina exchanged email communications with Harvest Fuels using the email address tmcclary@windstream.net.

  From its findings, the trial court concluded that:

- Harvest Fuels' claims arise from or relate to the McClarys' contacts with Texas.

- McClary Transport and McClary Oil are fictitious entities that have no legal form and are pseudonyms for Shannon and Tina McClary.

- The McClarys' contacts in Texas under the assumed names or on behalf of the fictitious entities McClary Transport and Mcclary Oil are their own personal contacts.

- The exercise of specific personal jurisdiction over the McClarys is consistent with federal and state due process standards.

- The McClarys' transactions with Harvest Fuels constitute "doing business" in Texas, as they contracted by mail or otherwise with a Texas resident, the contract was to be performed in whole or in part in Texas, and payment was to be wired to a Texas bank account. *See* TEX. CIV. PRAC. & REM. CODE § 17.042.

- The McClarys have sufficient minimum contacts with Texas to warrant the exercise of personal jurisdiction. They engaged in multiple business transactions with a Texas resident under fictitious corporate pseudonyms whereby they purchased and received blendstock fuel product at their facility in Anahuac, Texas.

15

- The McClarys' contacts were purposeful and intentional. The negotiated terms provided for purchase of the product and delivery in Texas, and the McClarys sought pecuniary benefit, advantage, or profit in Texas because the product was to be purchased and delivered in Texas.

- The McClarys' alleged liability for breach of contract, suit on sworn account, and negligent misrepresentation arises out of or is related to their activities in Texas.

- The McClarys did not meet their burden of negating all bases of jurisdiction alleged in Harvest Fuels' live petition and failed to respond to Harvest Fuels' jurisdictional allegations that (1) they acted as agents of a non-existent entity, McClary Transport, resulting in personal jurisdiction over them as the purported "agents" of the non-existent entity, (2) they acted as a de facto partnership doing business in Texas, and (3) they engaged in tortious in-state conduct by making negligent misrepresentations during the negotiation and performance of the trade agreements.

The McClarys appeal.

## Special Appearance

On appeal, the McClarys argue that the trial court erred in denying their special appearances because (1) the trade agreements violate Railroad Commission Statewide Rule 3.1 and therefore cannot support the exercise of specific jurisdiction, (2) regardless whether the trade agreements violate Rule 3.1, the McClarys did not establish minimum contacts to support the exercise of jurisdiction over them in their individual capacities, and (3) there is insufficient evidence to support various findings of fact made by the trial court.

16

## A. Applicable law and standard of review

A nonresident defendant is subject to personal jurisdiction in Texas if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction does not violate the due process guarantees of the federal and state constitutions. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 657 (Tex. 2010). The Texas long-arm statute allows the exercise of personal jurisdiction to reach as far as the federal constitutional requirements of due process will allow. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 17.042 (long-arm statute).

The exercise of personal jurisdiction is consistent with due process when the nonresident defendant has established minimum contacts with the forum state, and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Kelly*, 301 S.W.3d at 657. A nonresident defendant establishes minimum contacts with the forum state when it purposefully avails itself of the privilege of conducting activities within the state, thus invoking the benefits and protections of its laws. *Id.* at 657–58.

Depending on the nature of the nonresident's contacts, personal jurisdiction may be either general or specific. *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016). General jurisdiction is party-focused, whereas specific jurisdiction is transaction-focused. *Gulf Coast Int'l, L.L.C. v. Research Corp. of the Univ. of*

17

*Hawaii*, 490 S.W.3d 577, 584 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). This case concerns specific jurisdiction.

Specific jurisdiction arises when (1) the defendant's contacts with the forum state were purposeful and (2) the cause of action arises from or relates to those contacts. *Kelly*, 301 S.W.3d at 658. When a nonresident defendant is subject to specific jurisdiction, the trial court may exercise jurisdiction over the defendant even if the defendant's forum contacts are isolated or sporadic. *TV Azteca*, 490 S.W.3d at 37.

The first prong of specific jurisdiction, purposeful availment, is the "touchstone of jurisdictional due process." *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). It requires the nonresident defendant to have purposefully availed itself of the privilege of conducting activities in the forum state. *Id.* In determining whether a nonresident defendant has purposefully availed itself of the privileges of conducting activities in Texas, we consider the defendant's own actions without considering the unilateral activity of any other party and ask (1) whether the defendant's actions were purposeful rather than random, isolated, or fortuitous, and (2) whether the defendant sought some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* at 785.

The second prong of specific jurisdiction, relatedness, "lies at the heart of specific jurisdiction by defining the required nexus between the nonresident

18

defendant, the litigation, and the forum." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 579 (Tex. 2007). It requires that there be a "substantial connection" between the defendant's forum contacts and the "operative facts of the litigation." *Id.* at 585. In determining whether there is a substantial connection, we do not require proof that the plaintiff would have no claim "but for" the contacts or that the contacts were a "proximate cause" of the liability. *TV Azteca*, 490 S.W.3d at 52–53. Instead, we consider what the claim is "principally concerned with," whether the contacts will be "the focus of the trial" and "consume most if not all of the litigation's attention," and whether the contacts are "related to the operative facts" of the claim. *Id.* at 53.

Whether a court can exercise personal jurisdiction over nonresident defendants is a question of law, which we review de novo. *Kelly*, 301 S.W.3d at 657.

In a special appearance, the plaintiff and the defendant have shifting burdens of proof. *Id.* at 658. The plaintiff has the initial burden of pleading sufficient facts to bring the defendant within the reach of the Texas long-arm statute. *Id.* If the plaintiff meets its initial burden, the burden then shifts to the defendant to negate all bases of personal jurisdiction alleged by the plaintiff. *Id.* If, however, the plaintiff fails to meet its initial burden, the defendant need only prove that it is not a Texas resident to negate jurisdiction. *Id.* at 658–59. Because the plaintiff defines

the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading. *Id.* at 658. The defendant has no burden to negate a potential basis for personal jurisdiction when it is not pleaded by the plaintiff. *See id.*

The defendant can negate jurisdiction on either a factual or legal basis. *Proppant Sols., LLC v. Delgado*, 471 S.W.3d 529, 536 (Tex. App.—Houston [1st Dist.] 2015, no pet.). A defendant negates jurisdiction on a factual basis by presenting evidence showing an absence of contacts with Texas, thus disproving the plaintiff's jurisdictional allegations. *Id.* A defendant negates the legal basis for jurisdiction by showing that even if the plaintiff's alleged facts are true, the plaintiff's claims do not arise from the contacts. *Id.*

When, as here, the trial court denies a special appearance and issues findings of fact and conclusions of law relating to its ruling, the defendant may challenge the fact findings on legal and factual sufficiency grounds. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We review a trial court's conclusions of law as legal questions. *Id.* The defendant may not challenge a trial court's conclusions of law for factual insufficiency; however, we may review the trial court's legal conclusions drawn from the facts to determine their correctness. *Id.* If we determine a conclusion of law is erroneous, but the trial court

20

rendered the proper judgment, the erroneous conclusion of law does not require reversal. *Id.*

**B.    Analysis**

### 1.    Whether the trade agreements violate Rule 3.1

We begin by considering the McClarys' argument that the trial court erred in denying their special appearances because the trade agreements violate Railroad Commission Statewide Rule 3.1 and are therefore void. We disagree with the McClarys' argument for two reasons.

First, the McClarys' argument improperly reaches the merits of the case. Normally, when ruling on a special appearance, the trial court cannot reach the merits of the case. *Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 85–86 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The McClarys contend there is an exception for when a case arises from a contract. In such a case, the McClarys contend, the defendant can defeat jurisdiction by showing the contract is void. The McClarys misconstrue the scope of the exception.

The opinions cited by the McClarys establish that when a case arises from a contract, the defendant can defeat jurisdiction by showing that it did not enter into the contract, as such a showing negates the defendant's alleged actions forming the

basis of jurisdiction. *See Cobb v. Stern, Miller & Higdon*, 305 S.W.3d 36, 42–43 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (nonresident client not considered to have entered into contingency fee agreement with law firm because client exercised statutory right to void agreement before firm performed); *Phillips Dev. & Realty*, 499 S.W.3d at 86 (nonresident defendant argued it did not enter into contract because it executed contract by mistake); *Schuman v. TSP Dev., Ltd.*, No. 14-04-01159-CV, 2005 WL 1772262, at *3 (Tex. App.—Houston [14th Dist.] July 26, 2005, no pet.) (mem. op.) (nonresident defendants argued they never entered into any contract performable in Texas); *Ross F. Meriwether & Assocs., Inc. v. Aulbach*, 686 S.W.2d 730, 732 (Tex. App.—San Antonio 1985, no writ) (president of out-of-state corporation argued he did not enter into contract because he negotiated and executed contract in representative capacity).

But the McClarys do not contend that McClary Transport did not actually enter into the trade agreements. Instead, they contend the trade agreements violate Rule 3.1. But showing that the trade agreements violate Rule 3.1 does not negate the defendant's alleged actions forming the basis of jurisdiction; that is, it does not show that McClary Transport did not actually enter into the agreements.

Second, assuming the issue is relevant to our jurisdictional analysis, the trade agreements do not actually violate Rule 3.1. The McClarys construe Rule 3.1 as prohibiting the sale of blendstock to anyone who does not have on file with the

22

Railroad Commission an approved organization report. *See* 16 TEX. ADMIN. CODE § 3.1(a)(1). McClary Energy has an approved organization report. But the McClarys themselves do not. Because they do not individually possess an approved organization report, the McClarys argue that Harvest Fuels could not legally sell them blendstock. Thus, the McClarys conclude, the trade agreements violate Rule 3.1 to the extent the agreements purport to sell blendstock to the McClarys in their individual capacities, as alleged by Harvest Fuels. The McClarys misconstrue Rule 3.1.

Rule 3.1 requires "any person . . . performing operations within the jurisdiction of the Commission" to have "on file with the Commission an approved organization report." *Id.* The rule does not define "operations" but rather provides the following non-exhaustive list of examples:

> (A) drilling, operating, or producing any oil, gas, geothermal resource, brine mining injection, fluid injection, or oil and gas waste disposal well;
> (B) transporting, reclaiming, treating, processing, or refining crude oil, gas and products, or geothermal resources and associated minerals;
> (C) discharging, storing, handling, transporting, reclaiming, or disposing of oil and gas waste, including hauling salt water for hire by any method other than pipeline;
> (D) operating gasoline plants, natural gas or natural gas liquids processing plants, pressure maintenance or repressurizing plants, or recycling plants;
> (E) recovering skim oil from a salt water disposal site;
> (F) nominating crude oil;
> (G) operating a directional survey company;
> (H) cleaning a reserve pit;

23

(I) operating a pipeline;
(J) operating as a cementer approved for plugging wells, operating as a cementer cementing casing strings or liners, or operating a well service company performing well stimulation activities, including hydraulic fracturing; or
(K) operating an underground hydrocarbon or natural gas storage facility.

*Id.*

Thus, the list does not include the "selling, purchasing, or buying" of blendstock or language that could be reasonably construed to that effect. Instead, the listed examples all involve the performance of practical types of work, not the purchase of the material and equipment used to perform the work. Construing the list according to the contextual canon of noscitur a sociis, we hold that Rule 3.1 does not include the sale of blendstock as among those "operations" for which a person must have "an approved organization report." *See Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 61 (Tex. 2015) ("The canon of statutory construction known as *noscitur a sociis*—'it is known by its associates'—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it.").[1]

---

[1] We note that the trade agreements do not provide that McClary Transport will actually reclaim, treat, or process the blendstock. *See* 16 TEX. ADMIN. CODE § 3.1(a)(1)(B) (defining "operations" to include "reclaiming, treating, [and] processing" blendstock). Instead, the trade agreements merely provide that McClary Transport will purchase the blendstock. Under the trade agreements, Harvest Fuels agreed to sell and deliver the blendstock to McClary Transport. The delivery point was the reclamation facility owned by the McClarys individually

We hold that the McClarys cannot defeat jurisdiction by showing the trade agreements violate Rule 3.1.

## 2.    Whether the McClarys established minimum contacts

We now consider the McClarys' argument that even if the trade agreements comply with Rule 3.1, the McClarys have not established minimum Texas contacts to support the exercise of specific jurisdiction over them in their individual capacities. Specifically, the McClarys argue that they have not established minimum contacts because:

- their relevant Texas contacts were made in their corporate capacities on behalf of their Oklahoma limited liability company, McClary Energy, not their individual capacities on behalf of the fictitious entity, McClary Transport;

- Shannon's contacts were limited to "communications related to the execution and performance" of the three trade agreements; and

- Tina's contacts were limited to "e-mail communications regarding payment and deliveries" under the three trade agreements.

We consider each argument in turn, beginning with the first.

The McClarys' Texas contacts were made on behalf of the buyer under the trade agreements. The terms of the trade agreements were expressed in emails

and leased to McClary Energy. Thus, the blendstock was purchased by McClary Transport but reclaimed by McClary Energy, the latter of which had an approved organization report. We further note that Harvest Fuels did not actually transport the blendstock. *See id.* (defining "operations" to include "transporting" blendstock). Instead, Harvest Fuels contracted with third-party carriers to ship the blendstock from the point of origin to the delivery point.

Marlon sent Shannon on October 1, 2018; October 22, 2018; and December 27, 2018. *See Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 669 (Tex. 2020) (recognizing that "an agreement can be expressed in multiple writings exchanged between the parties" including "[e]mails"). In each of these emails, the buyer was identified as "McClary Transport." Shannon affirmatively confirmed the terms set forth in the October 1 email, and neither Shannon nor Tina objected to the terms set forth in the October 22 email or the December 27 email. Thus, under the unambiguous terms of the written trade agreements, the buyer is McClary Transport, not McClary Energy.

The McClarys contend the unambiguous terms of the written trade agreements are contradicted by their sworn declarations, in which they both state that all their Texas contacts relating to the trade agreements were made on behalf of McClary Energy. But under Texas law, it is well-established that "[a] party may not introduce parol evidence to vary the terms of an unambiguous contract." *Markert v. Williams*, 874 S.W.2d 353, 355 (Tex. App.—Houston [1st Dist.] 1994, writ denied); *see also DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("Evidence that violates the parol evidence rule has no legal effect."). Because the trade agreements

unambiguously identify the buyer as McClary Transport, the McClarys' declarations are inadmissible to show the buyer is McClary Energy.[2]

The McClarys further contend that the signboard at the entrance of their property, identifying McClary Energy as the licensed operator of the reclamation plant, shows they acted on behalf of McClary Energy, not McClary Transport. Again, we disagree. Like the McClarys' declarations, the signboard is inadmissible parol evidence; it cannot contradict or vary the unambiguous terms of the written trade agreements. Moreover, and as noted above, the fact that McClary Energy *reclaimed* the blendstock does not prove that it *purchased* the blendstock.

We hold that the McClarys' Texas contacts were made on behalf of McClary Transport. Because it is undisputed that McClary Transport is a fictitious entity and that Shannon negotiated and executed the trade agreements on McClary Transport's behalf, we further hold that Shannon is personally liable for the trade agreements and that McClary Transport's contacts are Shannon's personal contacts. *See Stacy v. Energy Mgmt. Grp. Ltd.*, 734 S.W.2d 149, 150 (Tex. App.— Houston [1st Dist.] 1987, no writ) ("[A]n agent who executes a contract on behalf of a fictitious principal is also personally liable on the contract for failure to accurately disclose his principal."); *Kahn v. Imperial Airport, L.P.*, 308 S.W.3d

---

[2] Harvest Fuels timely objected to the McClarys' declarations, but the trial court overruled its objection. The trial court erred in doing so; the declarations should not have been admitted into evidence.

27

432, 438 (Tex. App.—Dallas 2010, no pet.) (holding that defendant who "purported to sign" lease on behalf of DBA entity "bound only himself"); *A to Z Rental Car Ctr. v. Burris*, 714 S.W.2d 433, 436 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (discussing "general rule that one who contracts as an agent in the name of a nonexistent or fictitious principal, or a principal without legal status or existence, renders himself personally liable on those contracts"); RESTATEMENT (THIRD) OF AGENCY § 6.04 (2006) ("Unless the third party agrees otherwise, a person who makes a contract with a third party purportedly as an agent on behalf of a principal becomes a party to the contract if the purported agent knows or has reason to know that the purported principal does not exist or lacks capacity to be a party to a contract.").

We now turn to the McClarys' argument that Shannon's contacts are insufficient because they were limited to "communications related to the execution and performance" of the three trade agreements and "derive from Harvest Fuels' unilateral activity," as Harvest Fuels initially solicited the McClarys for business and not the other way around.

As just discussed, Shannon is personally liable for McClary Transport's Texas contacts. And those contacts are not limited to communications made in response to the initial solicitation of Harvest Fuels. Instead, these contacts include accepting multiple deliveries of blendstock at a facility in Texas and making

28

multiple payments to a bank account in Texas as part of an ongoing business relationship with a Texas fuel trader. Because McClary Transport's contacts are Shannon's personal contacts, we hold that Shannon has established minimum with Texas.

Finally, we consider the McClarys' argument that Tina's contacts are insufficient because they were limited to "e-mail communications regarding payment and deliveries" under the three trade agreements.

In its live petition, Harvest Fuels alleged that the McClarys' Texas contacts were made on behalf of the fictitious entity, McClary Transport. Harvest Fuels further alleged that in making these contacts, the McClarys acted as a de facto partnership under Chapter 152 of the Business Organizations Code. *See* TEX. BUS. ORGS. CODE § 152.051(b) ("[A]n association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name."). The McClarys denied Harvest Fuels' first allegation that their contacts were made on behalf of a fictitious entity. But they did not deny or otherwise respond to Harvest Fuels' second allegation that they acted as a de facto partnership.

Under Texas law, "all partners are jointly and severally liable for all obligations of the partnership." *Id.* § 152.304(a). So if the McClarys acted as a

partnership, then Tina is liable for Shannon's contacts, which, as just discussed, are sufficient to establish minimum contacts. By failing to deny or respond to Harvest Fuels' second allegation, the McClarys' failed to negate a basis for jurisdiction over Tina. We hold that Tina has established minimum contacts with Texas.

### 3. Whether the trial court's findings of fact are supported by sufficient evidence

Finally, we consider the McClarys' argument that the trial court erred in denying their special appearances because there is legally and factually insufficient evidence for various findings of fact made by the trial court in support of its rulings. The McClarys' challenges are primarily based on arguments that we have already discussed and rejected. Therefore, our analysis will be brief.

First, the McClarys challenge the trial court's findings that (1) doing business as McClary Transport, Shannon and Tina entered into the three trade agreements, and (2) Shannon and Tina conducted business with Harvest Fuels as McClary Transport. The McClarys argue that the evidence is insufficient to support these findings because (1) Shannon acted on behalf of McClary Energy and (2) Tina did not negotiate or enter into any agreement on behalf of any entity. But, as we have already discussed, the unambiguous terms of the written trade agreements show that Shannon negotiated, executed, and performed the trade agreements on behalf of McClary Transport and that Tina, for her part, performed the trade agreements on behalf of McClary Transport as well. And even though

30

Tina did not personally negotiate or execute the trade agreements, there is sufficient evidence to support a finding that Tina is personally liable for the trade agreements due to the McClarys' failure to respond to Harvest Fuels' allegations that the McClarys acted as a de facto partnership.

Second, the McClarys challenge the trial court's finding that neither Shannon nor Tina objected to any of the terms of the second and third trade agreements. The McClarys contend the finding erroneously assumes Tina received the terms of the second and third trade agreements, when she was not even copied on the emails. By this challenge, the McClarys make their own erroneous assumption that Tina had to have been included on the original emails memorializing the trade agreements in order to object to the terms or be held liable for the contract. Regardless of assumptions made by the finding, such assumptions do not change the undisputed fact that Tina made no objections to the trade agreements.

Third, the McClarys challenge the trial court's finding that each trade agreement required payment to be wired to Harvest Fuels' bank account located in Houston. The McClarys argue this finding lacks sufficient evidence because none of the trade agreements reference payment to be wired to Harvest Fuels' bank account located in Houston, Texas. We disagree. In the second trade agreement, beneath the "Delivery Date" term, Harvest Fuels provided the payment

information, including its bank's name, the routing number, and the account number. The email states that Harvest Fuels was *resending* this information, which indicates that the parties had previously discussed the location for payment.

Fourth and finally, the McClarys challenge the trial court's finding that Harvest Fuels delivered the blendstock to "McClary's tanks" in Anahuac, TX. The McClarys contend the finding is not supported by the evidence because "all deliveries that Harvest Fuels made related to the three alleged trade agreements at issue were made to McClary Energy, LLC's Reclamation Plant for reclaiming." The unambiguous terms of the trade agreements support the trial court's finding. Each agreement contains a delivery term requiring the blendstock to be delivered to "McClary's tanks (309 South FM1724 anawack tx, 77514)." The reference "McClary's tanks" could be reasonably construed to mean the tanks where McClary Transport's deliveries will be received at the delivery location.

We hold that the challenged findings are supported by legally and factually sufficient evidence. Accordingly, we hold that the trial court did not err in denying the McClarys' special appearances.

**Conclusion**

We affirm.

Gordon Goodman
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.