**Reverse and Rendered and Opinion filed August 22, 2025**



**In The**

# Fifteenth Court of Appeals

### NO. 15-24-00013-CV

**CECILE ERWIN, IN HER OFFICIAL CAPACITY AS THE EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN SERVICES COMMISSION; AND MICHELLE HILLSTROM, IN HER OFFICIAL CAPACITY AS THE REGION 3 DIRECTOR FOR COMMUNITY CARE SERVICES ELIGIBILITY FOR HEALTH AND HUMAN SERVICES COMMISSION, Appellants**

**V.**

**DALLAS COUNTY, TEXAS; AND MARIAN BROWN, IN HER OFFICIAL CAPACITY AS DALLAS COUNTY SHERIFF, Appellees**

**On Appeal from the 353rd District Court**
**Travis County, Texas**
**Trial Court Cause No. D-1-GN-23-001610**

## MEMORANDUM OPINION

This case addresses who pays for the cost of detaining certain criminal defendants awaiting transfer to the state hospital system. Texas law requires counties

to maintain a jail,[1] to "safely keep all prisoners committed to the jail by a lawful authority,"[2] and to pay "*for all expenses incurred* in the safekeeping of prisoners *confined in the county jail* or kept under guard by the county."[3] But must a county still pay when a prisoner is ordered committed to a state hospital, yet remains in county jail on a waitlist because no state hospital beds are available?

Dallas County and Marian Brown, in her official capacity as Dallas County Sheriff (together "the County") sued Cecile Erwin, in her official capacity as executive commissioner of the Health and Human Services Commission ("HHSC")[4] and HHSC official Michelle Hillstrom over delays due to the current waitlist. HHSC and Hillstrom appeal from the trial court's denial of their plea to the jurisdiction seeking to dismiss the suit on immunity grounds. We reverse and dismiss.

## Background

Texas law provides that criminal defendants who are determined to be incompetent to stand trial but are ineligible for bail "shall" be committed to a facility designated by HHSC for mental health treatment.[5] Defendants who have been acquitted of certain offenses by reason of insanity must also be committed.[6] Both are referred to as "forensic commitments."

HHSC manages ten facilities that provide treatment for multiple types of patients, including roughly 2,400 beds for forensic commitments. But the demand

---

[1] TEX. LOC. GOV'T CODE § 351.001(a).

[2] *Id.* § 351.041(a).

[3] TEX. CODE CRIM. PROC. art. 104.002(a) (emphasis added).

[4] All ultra vires claims here are brought against the Executive Commissioner in her official capacity; but for brevity we refer to them as brought against "HHSC" as "for all practical purposes" they are against the agency. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009).

[5] *See* TEX. CODE CRIM. PROC. arts. 46B.073(c), 46B.104.

[6] *Id.* art. 46C.251.

2

for those beds has expanded greatly over the past 20 years—forensic commitments increased from 16% of the state hospital population in 2001 to nearly 70% today.[7] Since 2006, there has been a long waitlist for HHSC's beds for forensic-commitment inmates.

Because these persons are not eligible for bail, those on the waitlist must remain confined in county jail or some other detention facility. The County alleges 364 persons confined in its county jail were on the waitlist as of March 2023; 311 had been waiting more than 45 days, and some for over two years. The County estimates that confining these patients has cost $7,510,152.40.

The County sued HHSC and Hillstrom seeking declaratory, injunctive, and mandamus relief challenging the waitlist.[8] Specifically, the County sought declarations that refusing to admit patients to the state system from the waitlist within 60 days is ultra vires because it violates state law and various constitutional provisions including the takings clause. The County asked the trial court to compel HHSC and Hillstrom to admit patients to a state hospital facility within 60 days, and failing which to reimburse the County for costs of detaining them locally.

HHSC and Hillstrom filed a plea to the jurisdiction arguing that the County lacked standing to sue Hillstrom, and had failed to plead any valid claims against HHSC. After a non-evidentiary hearing,[9] the trial court denied the plea as to both

---

[7]     Letter from Donald Lee to Greg Abbott, Crisis in Access to State Hospitals, JOINT COMMITTEE ON ACCESS AND FORENSIC SERVICES, 5 (Nov. 30, 2016), *available at* https://intranet.txcouncil.com/wp-content/uploads/2016/12/JCAFS-access-crisis-letter-to-leg-on-SH-capacity-crises-20161130-Final-Final.pdf.

[8]     *See* TEX. CIV. PRAC. & REM. CODE § 37.004 (permitting person whose "rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise" to seek declaration of rights).

[9]     The County says it submitted evidence by sworn declarations from an assistant district attorney and two county officials that verified the factual allegations in the County's original petition. As the standard of review already requires us to assume the truth of those allegations, we treat HHSC's plea to the jurisdiction as one challenging the County's pleadings. *See, e.g., Jones*

HHSC and Hillstrom. Both timely appealed.[10] The appeal was transferred to this Court in August 2024 following the Supreme Court's rejection of the County's challenge to the constitutionality of this Court.[11]

## Standard of review

When a jurisdictional plea challenges the pleadings (as here), courts must "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause."[12] We construe the pleadings liberally in favor of the pleader and look to its intent.[13] If the pleadings are not sufficient to invoke jurisdiction, the pleader should be afforded the opportunity to amend "if the challenged jurisdictional defect may be cured with further factual allegations."[14] We review a trial court's ruling on plea to the jurisdiction de novo as a question of law.[15]

## I.     The Claims Against Hillstrom

In the plea to the jurisdiction, appellants argued the County has no standing to sue Hillstrom because she has no connection to the waitlist or the state hospital system. The County responded that it accepted this representation and would file a motion to dismiss Hillstrom at a later date. Appellants' counsel observed at the hearing that none had yet been filed, and no motion to dismiss or nonsuit appears in the record. Even if the County intended to nonsuit Hillstrom, it did not do so before the trial court ruled on the plea.

---

*v. Turner,* 646 S.W.3d 319, 325 (Tex. 2022).

[10]     TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8).

[11]     *See In re Dallas Cnty.*, 697 S.W.3d 142, 165 (Tex. 2024).

[12]     *Herrera v. Mata*, 702 S.W.3d 538, 541 (Tex. 2024).

[13]     *Webster v. Comm'n for Lawyer Discipline*, 704 S.W.3d 478, 498 (Tex. 2024).

[14]     *Herrera*, 702 S.W.3d at 541.

[15]     *Id.*

"Without standing, a court lacks jurisdiction to resolve the asserted claims."[16] Standing requires "a concrete injury in fact that is fairly traceable to the defendant's alleged conduct that a favorable judicial decision would redress."[17] The "fairly traceable" element requires a causal connection between the plaintiff's injury and the defendant's conduct.[18] It is undisputed that Hillstrom has no control over state hospitals in general or the admission of patients in particular. We grant the plea to the jurisdiction as to Hillstrom.

## II.    The Ultra Vires Claim Against HHSC

"Although sovereign immunity generally bars lawsuits against state officials acting in their official capacities, the doctrine does not apply to suits seeking to require such officials to comply with the law."[19] To maintain an ultra vires suit, the claimant must "allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act."[20] An act is without legal authority if it requires discretion or judgment and the officer "exceeds the bounds of his granted authority or if his acts conflict with the law itself."[21] An act is ministerial if the law "prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment."[22]

The County argues that HHSC's waitlist is ultra vires in that extended delays in accepting forensic commitments exceed the bounds of HHSC's authority. The

---

[16]    *425 Soledad, Ltd. v. CRVI Riverwalk Hosp., LLC*, 709 S.W.3d 551, 557 (Tex. 2024).

[17]    *Leibman v. Waldroup*, 715 S.W.3d 367, 371 (Tex. 2025).

[18]    *Id.*

[19]    *Hartzell v. S.O.*, 672 S.W.3d 304, 311 (Tex. 2023).

[20]    *Id.*

[21]    *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016).

[22]    *Van Boven v. Freshour*, 659 S.W.3d 396, 402 (Tex. 2022).

County asserts this violates § 2(1) of Article 46.04 of the Texas Code of Criminal Procedure, which requires that forensic-commitment patients "must be transported directly to the facility within a reasonable amount of time and without undue delay."[23] We disagree for several reasons; when read in context and as a whole,[24] that article governs conditions *during* such transfers, not delays *before* they begin.

*First*, the text of § 2 of Article 46.04 (including § 2(1), the provision at issue here) addresses solely the *means* of transfer, not deadlines for them to take place. The title of § 2 is "Requirements For Transport," and it states in its entirety:

(1) *the patient must be transported directly to the facility within a reasonable amount of time and without undue delay*;

(2) a vehicle used to transport the patient must be adequately heated in cold weather and adequately ventilated in warm weather;

(3) a special diet or other medical precautions recommended by the patient's physician must be followed;

(4) the person transporting the patient shall give the patient reasonable opportunities to get food and water and to use a bathroom; and

(5) the patient may not be transported with a state prisoner.[25]

Every one of these provisions relates to conditions *during* a transfer. Under the *noscitur a sociis* canon, "the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it."[26] It is true that the dictionary definition of "directly" includes both "In a straight line or course" and

---

[23]  TEX. CODE CRIM. PROC. art. 46.04, § 2(1).

[24]  *In re Facebook, Inc.*, 625 S.W.3d 80, 87 (Tex. 2021).

[25]  TEX. CODE CRIM. PROC. art. 46.04, § 2 (emphasis added).

[26]  *Baumgardner v. Brazos River Auth.*, 714 S.W.3d 597, 604 n.9 (Tex. 2025) (quoting *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 61 (Tex. 2015)).

"Immediately."[27] But since *every other word* in this section addresses the *means* of transferring inmates, we cannot construe § 2(1) to suddenly shift the statute's focus to a requirement that HHSC accept them immediately upon request.

*Second*, the text and structure of the remainder of Article 46.04 supports this construction. The title of Article 46.04 as a whole is "Transportation to a Mental Health Facility or Residential Care Facility," and title of § 1 thereof is "Persons Accompanying Transport." Like § 2, every word of § 1 applies only to the conditions of transfer, stating that inmates [§1(a)] "shall be transported by a special officer for mental health . . . or by a sheriff or constable"; [§1(b)] shall be accompanied by "appropriate medical personnel" as needed; and [§1(c)] that female patients "must be accompanied by a female attendant."

*Third*, the bill analysis in the Texas Senate states the Article was adopted in response to reports from the Texas Department of Mental Health and Mental Retardation that mentally ill patients being transported from county jails to state mental health facilities "were spending long periods of time on buses making circular routes; being transported in buses without air-conditioning or heating; and being deprived of sufficient bathroom stops"; in some cases "patients have remained shackled for up to twenty-eight hours . . . denied adequate food and drink and . . . seated in an area of the van with no functional air conditioning and windows closed during periods of extreme heat."[28]

While many lawsuits have attacked prison overcrowding over the years,[29] the

---

[27]     *Directly*, Black's Law Dictionary 578 (12th ed. 2024).

[28]     Senate Research Ctr., Bill Analysis, Tex. S.B. 539, 76th Leg., R.S. (1999).

[29]     *See, e.g.*, *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part*, 688 F.2d 266 (5th Cir. 1982); *Alberti v. Sheriff of Harris Cnty., Tex.*, 978 F.2d 893, 894 (5th Cir. 1992); *Cook v. Ramsey I Unit,* No. CV H-24-2711, 2025 WL 902454, at *7 (S.D. Tex. Mar. 25, 2025); *Cnty. of Dallas v. Sempe*, 151 S.W.3d 291, 293 (Tex. App.—Dallas 2004), *pet dism'd w.o.j.*, 262 S.W.3d 315, 315–16 (Tex. 2008) (per curiam).

County identifies no case in which a Texas court has ever construed § 2(1) to place a limit on overcrowding either in local jails or in the state hospital system. Indeed, it appears that no Texas appellate court has ever construed § 2(1) at all.[30] Giving the clause in § 2(1) the ordinary meaning it had at the time of enactment,[31] as a matter of law the requirement that patients be transported "directly to the facility within a reasonable amount of time" applies to delays once transport *has begun*, not *before* one has begun. As Article 46.04 does not impose a deadline for transfers to HHSC or restrict the waitlist HHSC adopted to limit overcapacity, the County has not shown that HHSC committed an ultra vires act by failing to accept all forensic commitments regardless of other demands on its available capacity.

## III. The Constitutional Claims Against HHSC

The County argues in the alternative that maintaining the waitlist violates several provisions of the Texas Constitution. Sovereign immunity does not bar a suit to vindicate constitutional rights so long as the plaintiff alleges a facially valid claim.[32] The County argues that the waitlist effectively imposes an unconstitutional state ad valorem tax, creates an unconstitutional state debt, unconstitutionally requires the County to use its funds for a state purpose, violates the constitutional separation of powers, and constitutes an unconstitutional taking of the County's jail without compensation. We consider each in turn.

### 1. *Ad valorem Tax*

The Constitution provides that counties may levy ad valorem taxes for

---

[30] *Cf. Ward v. Young*, No. 1:16-CV-917-DAE, 2025 WL 879728, at *8 (W.D. Tex. Feb. 18, 2025) (holding the current appeal in this Court involving Article 46.04(2)(1) was "a distinct inquiry" from the Due Process challenges to the forensic-commitment waitlist in that litigation).

[31] *Miles v. Tex. Cent. R.R. & Infrastructure, Inc.*, 647 S.W.3d 613, 622–23 (Tex. 2022).

[32] *See Klumb v. Houston Mun. Employees Pension Sys.*, 458 S.W.3d 1, 13 (Tex. 2015).

"county purposes,"[33] but "[n]o State ad valorem taxes shall be levied upon any property within this State."[34] The County argues that by compelling the County to use local ad valorem taxes to pay the cost of confining forensic commitments, the State has adopted an unconstitutional state ad valorem tax.

An ad valorem tax "is a State tax when it is imposed directly by the State or when the State so completely controls the levy, assessment and disbursement of revenue, either directly or indirectly, that the authority employed is without meaningful discretion."[35] "Each case must turn on its own particulars."[36]

The requisite level of State control is not present here. Although HHSC's waitlist affects how much money the County spends on the County jail, it has not alleged that meeting those expenses effectively requires the County to levy taxes at a certain rate,[37] or removes its discretion to spend money on other programs. In essence, the County objects to the waitlist's indirect impact on other budgetary decisions. Although meaningful discretion "is an admittedly imprecise standard,"[38] we conclude that the County retains meaningful discretion over its tax rate.

### 2. State Debt

Next, the County alleges that the waitlist causes the County to incur an

---

33      TEX. CONST. art. VIII, § 1-a.

34      *Id.* art. VIII, § 1-e.

35      *Morath v. The Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 843 (Tex. 2016) (quoting *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489, 502 (Tex. 1992)).

36      *Id.* at 881.

37      *Cf. Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 770–71 (Tex. 2005) ("If school districts are forced to tax at or near maximum rates to meet constitutional and statutory requirements, then control over local ad valorem tax rates and spending effectively shifts to the State, depriving school districts of any meaningful discretion to tax below the rate cap set by the State or to spend on programs other than those required by the State and the Constitution.").

38      *Morath*, 490 S.W.3d at 881.

unconstitutional debt. The Texas Constitution provides that "[n]o debt shall be created by or on behalf of the State" except as specifically authorized by the Constitution.[39] The County argues that the waitlist forces the State to incur a debt to the County for the cost of housing patients on the waitlist. The ordinary meaning of "debt" is "[l]iability on a claim; a specific sum of money due by agreement or otherwise."[40] Having held Article 46.04 does not impose liability on the state to pay the costs imposed on the County's jail, we conclude it does not impose an unconstitutional "debt" on the State's behalf.

### 3. *Appropriation to private mental health providers*

The County also alleges that the waitlist violates Article XVI, Section 6 of the Constitution. The purpose of § 6 "is to prevent the application of public funds to private purposes; in other words, to prevent the gratuitous grant of such funds to any individual or corporation whatsoever."[41] It provides:

> (a) No appropriation for private or individual purposes shall be made, unless authorized by this Constitution. . . .
>
> (b) State agencies charged with the responsibility of providing services to those who are blind, crippled, or otherwise physically or mentally handicapped may accept money from *private or federal sources*, designated by the private or federal source as money to be used . . . in rehabilitating and restoring the handicapped . . . State agencies may spend money accepted under this subsection, *and no other money*, for specific programs and projects to be *conducted by local level* or other private, nonsectarian associations, groups, and nonprofit organizations ….
> This subsection does not prohibit state agencies authorized to render services to the handicapped from *contracting with* privately-owned or

---

[39]   TEX. CONST. art. III, § 49.

[40]   *Debt*, BLACK'S LAW DICTIONARY 506 (12th ed. 2024).

[41]   *State v. City of Austin*, 331 S.W.2d 737, 742 (Tex. 1960).

*local facilities* for necessary and essential services, subject to such conditions, standards, and procedures as may be prescribed by law.[42]

The County interprets the italicized phrases to mean (1) HHSC may not use "County money" (rather than "private or federal" money) on rehabilitation programs "to be conducted by local level" of government (i.e., the County jail); (2) HHSC can do so only by "contracting with privately-owned or local facilities" like the County's jail.

But this again assumes that the State is liable for expenses of detaining inmates locally while awaiting transfer to HHSC. No statute says so; state law provides that counties are "liable for all expenses incurred in the safekeeping of prisoners confined in the county jail,"[43] and it does not provide any exception that could apply here. As a result, HHSC is not using County money to cover such costs; *the County* is using County money. The statute does not address mental health care for forensic-commitment patients, and nothing in its text *requires* the State to contract with the County for what the County must by law provide. We hold the County has not alleged a valid claim based on Article XVI, section 6.

### 4. *Separation of Powers*

The County argues that the waitlist violates the constitutional separation of powers by infringing on the power of the County's commissioners court to set the County's budget, a legislative function.[44] But the Texas Constitution requires separation into "three distinct departments" of the "powers of the Government *of the State of Texas*."[45] It does not require separation of powers between the State and

---

[42] TEX. CONST. art. XVI, § 6 (emphasis added).

[43] TEX. CODE CRIM. PROC. art. 104.002(a).

[44] *See* TEX. LOC. GOV'T CODE §§ 111.033, .039, .041 (pertaining to County budget created by Commissioners Court).

[45] TEX. CONST. art. II, § 1.

local governments.[46] The County's authority "is derived from the State's authority"; "[r]arely in Texas law would a direct conflict between state authority and local authority be resolved in favor of local authority."[47] The Legislature requires the County to pay for prisoners confined in the County jail,[48] and nothing in the Constitution grants county commissioners courts exemption from that requirement.

### 5. *Takings Claim*

Finally, we turn to the County's takings claim. The Texas Takings Clause provides that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made."[49] The County argues that requiring the County to bear the costs of housing those on the waitlist amounts to an inverse condemnation of the County's jail.

"Only affirmative conduct by the government will support a takings claim."[50] The County alleges no affirmative conduct by HHSC regarding forensic-commitment patients; it alleges only HHSC failed to act by accepting them or cooperate with the County's efforts to transfer them out. As the Supreme Court has said, "We have not recognized a takings claim for nonfeasance."[51] We hold the County has not alleged a valid constitutional takings claim.

---

[46]    *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 72 (Tex. 2000); *see also El Paso Cnty. v. El Paso Cnty. Emergency Services Dist. No. 1*, 622 S.W.3d 25, 41 (Tex. App.—El Paso 2020, no pet.); *A.H.D. Houston, Inc. v. City of Houston*, 316 S.W.3d 212, 222 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

[47]    *Abbott v. Harris Cnty.*, 672 S.W.3d 1, 5–6 (Tex. 2023).

[48]    TEX. CODE CRIM. PROC. art. 104.002(a).

[49]    TEX. CONST. art. I, § 17.

[50]    *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016).

[51]    *Id.* at 800.

## IV. The Disposition of claims against HHSC

Having found the County has alleged no valid claims of ultra vires or unconstitutional acts, all that remains is the disposition.

"When a plaintiff fails to plead facts sufficient to demonstrate the trial court's jurisdiction, courts generally should afford the plaintiff the opportunity to replead unless the pleadings affirmatively negate the existence of jurisdiction."[52] The County includes an alternative request that we remand this case to the trial court for more pleadings "and/or" discovery on jurisdictional facts should we find that its sworn petition is "insufficient to determine the nature and purpose of the statutory objectives for jurisdictional purposes." But our duty is to apply the plain meaning of the text, which we find unambiguous.

There does not appear to be any dispute about the number of inmates awaiting transfer to HHSC, or the length of time they have been waiting. HHSC's plea raised only legal obstacles to jurisdiction, not factual ones: there is no statutory deadline requiring HHSC to accept transfers any faster. The County suggests discovery may be necessary on when a delay becomes unreasonable, or when costs imposed on the County become unreasonable. But state law requires counties to bear the costs of county jails; the County has not pointed to any law shifting those costs to the State if they become "unreasonable."

"Generally, remand is a mechanism for parties over whose claims the trial court may have jurisdiction, to plead facts tending to establish that jurisdiction, *not* for parties, over whose claims the trial court does not have jurisdiction, to plead new claims over which the trial court does have jurisdiction."[53] There was little time and

---

[52] *Fraley v. Tex. A & M Univ. Sys.*, 664 S.W.3d 91, 101 (Tex. 2023) (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004)).

[53] *Clint Indep. School Dist. v. Marquez*, 487 S.W.3d 538, 559 (Tex. 2016) (emphasis added) ("Here, the jurisdictional bar arises not from a lack of factual allegations but from the nature of the parents' claims. The parents do not propose to add more jurisdictional facts. Instead, they suggest

apparently no discovery below before the trial court denied HHSC's plea, which it did less than two months after it was filed. But in its appellate brief the County does not suggest what jurisdictional facts it might add that could remove the legal obstacle facing the statutory and constitutional claims it has raised here. The Legislature may respond to the difficulties the County raises here, but we cannot leave this case in legal limbo until it does.

## Conclusion

There is no easy solution to the problem of criminal acts by those with mental health conditions. An amicus brief by the Texas Association of Counties reports that this problem has "a significant impact on county finances … and employees." The Legislature has indicated awareness of the problem, and in 2023 responded by allocating over $2 billion to expand the HHSC's capacity,[54] and directing HHSC to prioritize admissions from the forensic commitment waitlist.[55] But it rejected bills that would have required HHSC to accept transfers within 21 or 45 days.[56] We do not infer that the Legislature necessarily rejected those as goals,[57] but we cannot infer from their failure that this Court has authority to impose them judicially.

We reverse the trial court's order and render judgment dismissing the County's suit for want of jurisdiction with prejudice.

---

they can 'cure' the jurisdictional defect by changing the claims they are bringing.").

[54] *See generally* H.B. 1, 88th Legislature, R.S. 2023 (Article II, HHSC).

[55] H.B. 1, 88th Legislature, R.S. 2023 (Article II, HHSC, Rider 109). HHSC used the additional funds to expand capacity at the state hospitals and to fund jail-based competency restoration programs. *See* 2023 Waitlist Report, 9, https://www.hhs.texas.gov/sites/default/files/documents/mhs-waiting-lists-may-2023.pdf.

[56] *See* H.B. 479, 88th Leg., R.S. (2023) (21-day time limit); H.B. 2733, 88th Leg., R.S. (2023).

[57] *See Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 453 (Tex. 2012).

14

/s/      Scott A. Brister
Scott A. Brister
Chief Justice

Before Chief Justice Brister and Justices Field and Farris.